Fred G. HAYDEN, d/b/a Houston International Airport Limousine Service,
Appellant,

v.

A. G. BOWEN et al., Appellees.

No. 25836.

United States Court of Appeals
Fifth Circuit.

Nov. 26, 1968.

Rehearing Denied Dec. 26, 1968.

Robert L. Burns, Sears & Burns, Houston, Tex., for appellant.

George C. Dixie, Dixie, Wolf & Hall, by Chris Dixie, Houston, Tex., for appellees.

Charles Donahue, Sol., Bessie Margolin, Assoc. Sol., Dept. of Labor, Washington, D. C., Robert E. Nagle, Helen W. Judd, Attys., U. S. Dept. of Labor, Washington, D. C., Major J. Parmenter, Regional Atty., amici curiae.

Before GEWIN, PHILLIPS * and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

The appellees, former employees of Houston International Limousine Service, brought this action in the United States District Court for the Southern District of Texas to recover unpaid minimum wages and overtime compensation under the Fair Labor Standards Act of 1938 as amended.[1] The primary question presented is whether the appellees were engaged in "commerce" within the meaning of the Act. The district court answered this question in the affirmative and ruled against the limousine service on its subsidiary contentions. We affirm.

Houston International Airport, located within the city near its southern boundary, is approximately eleven miles from downtown Houston. During the period relevant to this suit transportation between the airport and points within the city was provided primarily by taxicabs, limousines, and private automobiles. With the exception of chartered buses on a few occasions, no public transit system served the airport. Houston International Limousine Service, owned by appellant Hayden, operated out of the airport under a franchise granted by the city of Houston, which owns and operates the airport. The franchise permitted Hayden to transport persons from the airport to hotels, offices, and apartment buildings within the city and from these points to the airport.[2] The director of the city's department of aviation designated the specific pickup and delivery points.

The franchise required that Hayden provide air conditioned limousines around the clock in sufficient numbers to meet the demand for ground transportation resulting from scheduled incoming and outgoing flights, and that the service be so spaced that under normal conditions no more than one hour would elapse between the arrival of a scheduled aircraft and the arrival of its passengers at the designated points in the city, or between the departure of passengers from any designated point in the city and the departure of the aircraft. Additionally, the franchise directed that the limousines be used exclusively to provide public airport ground transportation services. Fares were also fixed by the franchise.

Section 3(b) of the Fair Labor Standards Act provides:

"Commerce" means trade, commerce, transportation, or communications among the several States or between any State and any place outside thereof.[3]

Whether an employee is engaged in commerce is determined by practical considerations, not by technical concepts. The test is whether the employee's work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be a part of it, rather than isolated local activity.[4] It is established in this circuit that the

---

* Judge Harry Phillips of the Sixth Circuit, sitting by designation.

1. 29 U.S.C. §§ 201–219 (1964).

2. In addition to its regular business of transporting airline passengers and personnel, the limousine service also carried intra-company mail for the airlines between their airport and downtown offices, delivered mishandled luggage from the airport to the owner's hotel and, on occasion, carried passengers whose flights had been grounded in Houston to their scheduled destinations or to a point where they could obtain a nongrounded flight.

3. 29 U.S.C. § 203(b) (1964).

4. Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1954).

Act is to be given a liberal interpretation.[5]

■ Hayden contends that the Supreme Court's holding in United States v. Yellow Cab Co.[6] dictates the conclusion that the appellees were not engaged in commerce. In *Yellow Cab* the Court declared, after examination of the practical considerations involved, that taxicabs which carried passengers from their hotels, homes, and offices in Chicago to the railroad station, and conversely, were not an integral part of interstate commerce because their relation to interstate transit was too casual and incidental. An analysis of the facts which the Court considered in reaching its result makes it obvious, however, that *Yellow Cab* does not govern the fact situation presented by the case *sub judice*. The taxicabs in that case did not serve railroad passengers exclusively; quite the contrary, they were required to serve every person within the city. The cabs were under no contractual duties relating to rail movement. Railroad travelers had complete freedom to arrive at or leave the station by cab, trolley, bus, subway, elevated train, private automobile or various other means of conveyance. The present case is hardly analogous. Hayden's limousine service was an important means of ground transportation available to travelers. But of greater significance is the fact that air travel, predominately interstate, into and out of the Houston International Airport was the very lifeblood of the limousine service and, with few exceptions, the exclusive source of its patronage. The limousine service worked hand-in-glove with the airlines. Coordination of flight schedules with Hayden's operation was vitally important to both enterprises. Hayden's dispatchers would acquire from the airlines the number of passengers who needed transportation from their respective hotels to the airport and, then dispatch the proper number of limousines to the hotels. And when a flight schedule was changed, notice of the change was sent to the limousine office. Thus it is clear that the *Yellow Cab* case is no authority for holding that Hayden's limousine operation was only casually or incidentally related to interstate transit. The essential nature of Hayden's business was the transportation of airline passengers to and from the Houston International Airport.[7]

Hayden places great reliance upon Mateo v. Auto Rental Co.,[8] in which the Ninth Circuit held that employees of

---

5. Mitchell v. Empire Gas Eng'r Co., 256 F.2d 781, 784 (5th Cir. 1958). The broad construction given "commerce" by a growing accumulation of cases has brought within the Act's reach a varied assortment of employees. See Mitchell v. Lublin, McGaughy & Assoc., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959) (employees of an architectural firm who prepared plans and specifications for air bases and other interstate instrumentalities); Allen v. Atlantic Realty, 384 F.2d 527 (5th Cir. 1967) (building service and maintenance employees of realty company which leased premises to interstate telephone company); Wirtz v. Atlantic States Construction Co., 357 F.2d 442, 447 (5th Cir. 1966) (employees of a construction company building an improvement to a port facility); Wirtz v. B. B. Saxon Company, 365 F.2d 457, 461 (5th Cir. 1966) (employees of an independent company which had contracted to repair vehicles used in operation of an air base); Goldberg v. P & L Equipment Co., 311 F.2d 88 (5th Cir. 1962) (night watchman employed by a company constructing a city street used by trucks carrying mail and other interstate cargo); Public Building Auth. of B'ham. v. Goldberg, 298 F.2d 367 (5th Cir. 1962) (building service and maintenance employees in building which was leased to federal agencies and in which federal employees produced goods for commerce).

6. 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

7. Hayden testified during the trial as follows:
   Q. Isn't the essential nature of your business to get those passengers in and out of that airport?
   A. And we do.
   Q. That's the essential nature of your business?
   A. Yes.

8. 240 F.2d 831 (9th Cir. 1957).

Auto Rental, who were engaged in transporting airline passengers between the Honolulu Airport and downtown districts, were not as a practical matter involved in interstate movement. There are, however, important dissimilarities between the facts in that case and the facts in the case before us. Auto Rental did not operate under the strictures of a franchise. The company determined its own pickup and delivery points, was under no obligation to coordinate its activities with flight schedules, and was free to use its limousines for purposes unrelated to airport transportation. And, unlike Hayden's operation, it was engaged in stiff competition with other "airporter" systems. Whether this court would have reached the *Mateo* result on these facts is a question we need not decide. But we have no difficulty in concluding that *Mateo* should not govern the result in the present case.

The facts in this case are not significantly different from those upon which the Fourth Circuit based its finding in Airlines Transp., Inc. v. Tobin[9] that a limousine service operating out of the Raleigh-Durham Airport was engaged in commerce. Airline Transportation had contracted with three airlines to provide their passengers with ground transportation between the airport and downtown points designated by the airline companies. The limousines were to be used exclusively in this service. The municipalities of Raleigh and Durham fixed the fares to be charged. In addition to the limousines, commercial transportation to and from the airport was available by bus and taxicab. By their contracts, the airlines had much the same control over limousine operations

as did the city of Houston by its franchise. We do not view the absence of comprehensive contractual ties between Hayden and the airlines as a basis for factually distinguishing the two cases because the terms of the franchise sufficiently obligate Hayden to provide the service which was the object of the airlines contracts in *Tobin*.

The result in *Tobin* and the conclusion which we reach in this case are supported by the Supreme Court's decision in *United States v. Capital Transit Co.*[10] Residents of the District of Columbia who worked in government offices in Virginia daily boarded local buses near their homes which took them to a terminal within the District, where they changed to different buses which then took them on to Virginia. The Court held that the passengers' interstate journey to work actually began at the time they boarded the first bus near their homes and ended when they alighted from the bus at their place of employment in Virginia. The Court acknowledged that the interstate trip was broken at the terminal but concluded that, in the "commonly accepted sense of the transportation concept," the entire trip was interstate.[11] Although this case is a pre-*Yellow Cab* decision, the Court has pointed out in a subsequent opinion that *Yellow Cab* does not conflict with the *Capital Transit* case.[12]

Hayden contends further that he was exempt from the requirements of the Act even if the appellees were engaged in commerce, because his limousine service was a local motor bus carrier and, therefore, exempt from the minimum wage and hour requirements.[13]

9. 198 F.2d 249 (4th Cir. 1952).

10. 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663 (1945).

11. 325 U.S. at 363, 65 S.Ct. at 1179.

12. United States v. Capital Transit Co., 338 U.S. 286, 290, 70 S.Ct. 115, 94 L.Ed. 93 (1949).

13. Section 13(a)(9) of the Act, 29 U.S.C. § 213(a)(9) (1964), prior to the 1966 amendments provided:

The provisions of sections 206 and 207 of this title [relating to minimum wage and hour requirements] shall not apply with respect to—
any employee of a street, suburban or interurban electric railway, or local trolley or motor bus carrier, not in an enterprise described in section 203(s)(2) of this title.

We agree with the Wage and Hour Administrator that

> [t]he indispensable characteristic of a local motor bus carrier is that it is a carrier which serves an integrated commercial or industrial area for the purposes of carrying persons to and from their work in offices and factories, children to and from school daily, and other persons attending to necessary routine business.[14]

This definition accords with the ordinary and commonly understood meaning of the term "local motor bus carrier." We think it manifest that Hayden's limousine service did not fall within the terms of the definition and, therefore, that it was not exempt from the minimum wage and hour provisions.[15]

■ Hayden argues, alternatively, that even if the appellees were covered by the Act, the tips which they received in the performance of their duties should be computed in determining their minimum wages. The Act originally made no reference to tips in defining the terms "wages." [16] In spite of this, however, the courts construed the statute to permit consideration of tips in computing the amount of minimum wages and overtime compensation.[17] But in each of the cases which have held that tips must be considered, there has existed an agreement between the employer and the employee that tips should be kept by the employee as compensation. We believe the language of these cases implies that in the absence of such an agreement tips should not be considered in computing an employee's minimum wage. The district court found that Hayden did not have an understanding with his employees that tips would be a part of their compensation and we reject Hayden's contention that this finding is clearly erroneous.[18]

■ Finally, Hayden contends that the court's award of attorney's fees to the appellees' counsel should have been made conditional upon counsel's surrender of all rights to additional compensation which might exist under a contingent-fee contract with the appellees. We need not reach this contention. The contractual arrangements between employees and their counsel are their concern and the employer has no standing to seek the disruption of those arrangements.[19] The appellees, apparently satisfied with their counsel's representation to the district court that he would credit the award to the contingent-fee amount, express no disenchantment with the court's award and, therefore, we see no reason to tamper with it.

We have considered all of the contentions urged by the appellant and find them without merit.

Affirmed.

14. Wage & Hour Release, March 6, 1944, 1 CCH 1968 Lab.L.Rep. Wages & Hours ¶ 25,266.05, at 38,604. See Gillette v. Rockland Coaches, 142 F.2d 616, 618–619 (2d Cir. 1944).

15. See Wirtz v. Cincinnati, Newport and Covington Transp. Co., 375 F.2d 513 (6th Cir. 1967); and Yogurt Master, Inc. v. Goldberg, 310 F.2d 53, 55 (5th Cir. 1962).

16. The appellees' claims are based on violations of the Act which occurred during the period from June 21, 1961 to February 12, 1965. The Act was amended in 1966 to permit employers to consider tips in computing wages for purposes of the minimum wage and hour provisions. 29 U.S.C. § 203(m) (Supp.1966).

17. Williams v. Jacksonville Terminal Co., 315 U.S. 386, 397, 62 S.Ct. 659, 86 L.Ed. 914 (1942); Moyd v. Atlantic Greyhound Corp., 170 F.2d 302, 303 (4th Cir. 1948); Southern Ry. Co. v. Black, 127 F.2d 280, 284 (4th Cir. 1942). See also Annot., 65 A.L.R.2d 974 (1959).

18. Chaney v. City of Galveston, 368 F.2d 774, 776 (5th Cir. 1966). See Fed.R.Civ. P. 52(a).

19. Skidmore v. John J. Casale, Inc., 160 F. 2d 527, 531 (2d Cir. 1947).