Jim **BINGHAM**, Bill Bridges, Richard Glover, Hershel Lambert, on behalf of themselves and on behalf of other employees similarly situated, Plaintiffs,

v.

**AIRPORT LIMOUSINE SERVICE,** Defendant.

No. HS–68–C–33.

United States District Court, W. D. Arkansas, Hot Springs Division.

July 1, 1970.

Silas Brewer, of McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for plaintiffs.

Hobbs & Longinotti, Hot Springs, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

This is a private lawsuit filed by plaintiffs on November 5, 1968, whereby they seek recovery of unpaid compensation, unpaid overtime compensation, an additional equal amount as liquidated damages and a reasonable attorney's fee from defendant pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended. 29 U.S.C. § 201 et seq.

Plaintiffs contend that, while employed by defendant, they were regularly and customarily engaged in interstate commerce, performing duties as limousine drivers transporting passengers, luggage, mail and air express items from the Hot Springs, Arkansas, Municipal Airport to locations within the City of Hot Springs, a substantial portion of such passengers and property having begun their journey in states other than Arkansas. They allege that defendant has failed and refused to compensate them at the prescribed minimum wage and overtime rate for their respective periods of employment.

Defendant admits that plaintiffs were engaged in commerce while employed by him, but denies that he failed to compensate them at the minimum wage rate required by the Act; defendant affirmatively pleads that plaintiffs were "tipped employees" within the provisions of 29 U.S.C. § 203(m) and (t),[1] and that the wages of plaintiffs should be deemed to be increased by the amount of such tips; that the wages of plaintiffs include the reasonable cost to defendant of furnishing plaintiffs uniforms for their use and benefit and the use of a motor vehicle 24 hours per day during working days, which vehicles were entirely maintained and repaired by defendant;[2] that the claims of plaintiffs for wages due prior to November 5, 1966, are barred by limitations; that the claim of plaintiff Bingham is entirely barred by reason of a release executed by Bingham on October 12, 1968; and that the overtime compensation provisions of the Act do not apply to plaintiffs by virtue of 29 U.S.C. § 213(b) (1).

The following shall constitute the findings of fact and conclusions of law

---

1. A "tipped employee" is defined by 29 U.S.C. § 203(t) as " * * * any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips."

29 U.S.C. § 203(m) provides in part that:

" 'Wage' paid to any employee includes the reasonable cost, *as determined by the Administrator*, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees: * * * *Provided further*, That the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value. Such evaluations, where applicable and pertinent, shall be used in lieu of actual measure of cost in determining the wage paid to any employee. In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage rate, except that in the case of an employee who * * * *shows to the satisfaction of the Secretary* that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased under this sentence, the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount." (Emphasis supplied.)

2. *Id.* 29 U.S.C. § 203(m).

of the court, as contemplated by Rule 52(a), Fed.R.Civ.P.

The court has jurisdiction by virtue of 28 U.S.C. § 1337 and 29 U.S.C. § 216 (b).

■ Although the defendant is not an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203 (s), each plaintiff was engaged in commerce during each workweek of his employment with defendant, in that plaintiffs engaged in regular and continuous handling and transporting of persons and property which had moved in commerce. Each, in his capacity as a driver for defendant's Airport Limousine Service, handled and transported passengers, luggage, mail and air freight on a daily basis, a substantial portion of which originated in other states. Mail matter was handled and transported by plaintiffs pursuant to a contract between defendant and the United States Postal Department which obligated defendant to pick up mail several times daily at the Hot Springs Post Office and deliver it to the Hot Springs Memorial Airport for air transportation and vice versa. The defendant provided limousine service for all incoming and outgoing flights seven days per week. During some months of the year the Airport Limousine Service transported over two thousand passengers and their luggage to and/or from the Hot Springs airport. The court must conclude, and defendant does not dispute, that the activities of plaintiffs are so directly and vitally related to interstate commerce as to be in practice and legal contemplation a part thereof. Wirtz v. First State Abstract and Insurance Co., (8 Cir. 1966) 362 F.2d 83, and cases there cited at page 87. Plaintiffs therefore fall within the minimum wage coverage of Section 206 of the Act.

However, the overtime compensation provisions of Section 207 of the Act do not apply with respect to any of the plaintiffs. Section 213(b), 29 U.S.C.A. § 213(b), contains numerous exemptions from the overtime requirements of the Act, including Section 213(b) (1), which provides:[3]

"(b) The provisions of section 207 of this title shall not apply with respect to—

"(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49;"

■ Section 204 of the Motor Carrier Act, 49 U.S.C. § 304, provides in part that the Commission shall have the duty to regulate common carriers by motor vehicle, contract carriers by motor vehicle, and to establish for private carriers of property by motor vehicle reasonable requirements to promote safety of operation, if need therefor is found. It is well settled that it is not necessary for the Secretary of Transportation to have actually established qualifications and maximum hours of service for the Section 213(b) (1) exemption to apply. The mere existence of his power to do so is sufficient. Levinson v. Spector Motor Service, (1947) 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158; Galbreath v. Gulf Oil Corporation, (N.D.Ga.1968) 294 F. Supp. 817.

It would appear that defendant is a "common" and "contract" carrier within the meaning of 49 U.S.C. § 303(a). It is there provided that a "common carrier by motor vehicle" is:

"* * * any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, * * *."

---

3. Section 213(b) (1) has been unchanged in substance during all times pertinent to this litigation. The 1966 amendments to the Act merely substituted "Secretary of Transportation" for "Interstate Commerce Commission."

The term "contract carrier by motor vehicle" is defined as:

"＊ ＊ ＊ any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation ＊ ＊ ＊, under continuing contracts with one person or a limited number of persons ＊ ＊ ＊ for the furnishing of transportation services designed to meet the distinct need of each individual customer."

In addition to his contract with the United States Postal Department, defendant has a contract with the airlines serving the Hot Springs airport, under which he is obligated to provide transportation for their passengers and air freight. Defendant also holds himself out for hire to the general public for the transportation of passengers and property over a regular route to and from the airport.

As the Motor Carrier Act and the Fair Labor Standards Act cannot both apply in this connection, Morris v. McComb, (1947) 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44, the construction of the Motor Carrier Act must here control. "Interstate commerce" is defined in the Motor Carrier Act as follows:

"The term 'interstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water ＊ ＊." 49 U.S.C. § 303(a) (10).

■ Under the Motor Carrier Act, interstate commerce does not mean that there must be an actual carriage of goods across state lines, and the fact that the operations of plaintiffs were wholly within the State of Arkansas is thus not decisive. Morris v. McComb, supra; Walling v. Jacksonville Paper Co., (1943) 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Beggs v. Kroger Co., (8 Cir. 1948) 167 F.2d 700. The ultimate question is whether the transportation here involved a "practical continuity of movement" from other states to locations within the City of Hot Springs or whether the passengers and property here involved lost their character as interstate commerce when they came to rest at the Hot Springs Memorial Airport. Walling v. Jacksonville Paper Co., supra. The court holds that there was continuity of movement so that the passengers and property were moving in commerce not merely to the airport but all the way to their ultimate destination at points within the city.

As the court in Jacksonville Paper stated at 317 U.S. 568, 63 S.Ct. 335:

"＊ ＊ ＊ (I)f the halt in the movement ＊ ＊ ＊ is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points."

It is, of course, true that Jacksonville Paper involved a construction of the Fair Labor Standards Act, but the courts have since had no hesitation or difficulty in applying the test there enunciated in reaching a conclusion that goods "continuously moving" in interstate commerce were subject to the Motor Carrier Act and exempt from the Fair Labor Standards Act. Shew v. Southland Corp., (5 Cir. 1966) 370 F.2d 376; Beggs v. Kroger Co., supra; Martinez v. Phillips Petroleum Co., (D.Ida.1968) 283 F.Supp. 514.

■ It should be added that the court does not construe the words "rail, express, or water" in 49 U.S.C. § 303(a) (10) to be words of limitation, at least insofar as they relate to the jurisdiction of the Secretary of Transportation to establish qualifications, maximum hours of service of employees, and standards of equipment. Though Congress did not specifically refer to air service, it should be kept in mind that when this section was adopted, in the 1930's, air transportation was then considered essentially "express service." Zantop Air Transport, Inc., v. United States, (E.D. Mich.1965) 250 F.Supp. 623. The power

provided by the Motor Carrier Act extends to the "transportation of passengers or property by motor carriers engaged in interstate or foreign commerce" which would seem to include all interstate commerce unless specifically limited by the Act. This view is strengthened by the wording of 49 U.S.C. § 303(b) which provides in part that:

"Nothing in this chapter, *except the provisions of section 304 of this title relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment* shall be construed to include \* \* \* the transportation of persons or property by motor vehicle when incidental to transportation by aircraft;" (Emp. added)

Even assuming, arguendo, that the transportation provided by defendant is incidental to transportation by aircraft within the meaning of the statute, it is quite clear that the limitation has no application to the power of the Secretary to impose safety regulations. In addition, it would not be in keeping with a practical conception of interstate commerce to hold that a motor carrier carrying the same goods on the last leg of an interstate journey is subject to the Motor Carrier Act if the goods are picked up from an interstate train but not from an interstate airplane. It is the part played by the motor carrier in interstate commerce and not the mode of previous transportation that is essential to the Secretary's power to impose maximum hours of service and other safety regulations.

■ The court thus concludes that defendant is a common and contract carrier within the meaning of the Motor Carrier Act, and that the Secretary of Transportation had the power to establish qualifications and maximum hours of service with regard to plaintiffs. It cannot be doubted that drivers such as plaintiffs, who often worked ten or more hours daily on consecutive days, constitute a potential highway safety danger.

The Secretary and the ICC are vitally concerned with the safety of interstate and foreign commerce, and the power to restrict the number of hours which those who so engage may work in any one workweek is obviously intended to aid in preventing accidents due to fatigue, without regard to adequacy of compensation.

Prior to the 1966 amendment to Section 203(m),[4] the definition of wages under the Act was silent as to whether "tips" could be included by employers in determining wages paid. Several early decisions held that tips received by redcaps could be counted as a part of the required minimum wage, at least where there was an agreement to that effect between the employees and their employer, and a guaranty of an amount sufficient to equal the minimum wage. Williams v. Jacksonville Terminal Co., (1942) 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914, reh. den. 315 U.S. 830, 62 S.Ct. 909, 86 L.Ed. 1224; Townsend v. New York C. R. Co., (7 Cir. 1944) 141 F.2d 483, cert. den. 323 U.S. 717, 65 S.Ct. 47, 89 L.Ed. 577; Ryan v. Denver Union Terminal R. Co., (10 Cir. 1942) 126 F.2d 782; Harrison v. Kansas City Terminal R. Co., (8 Cir. 1942) 126 F.2d 421. Under such an agreement, the employees were required to report daily the sums they received as tips, and the employer guaranteed to pay them a sum equal to the minimum wage if the tips were insufficient, although the guaranty agreement obviously added nothing to the requirements of the Act. The employees were allowed to keep all tips received even if the total exceeded the minimum wage. More recently, yet involving violations which occurred prior to the 1966 amendments, it has been held, without mention of an accounting, that an agreement is necessary to consider tips in computing an employee's minimum wage. Hayden v. Bowen, (5 Cir. 1968) 404 F.2d 682, cert. den. 395 U.S. 933, 89 S.Ct. 1995, 23 L.Ed.2d 448.

---

4. Footnote 1, supra.

The 1966 amendments to the Act make it clear that, as a matter of law, the amount paid a tipped employee, within the meaning of the Act, *shall* be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 percent of the applicable minimum wage. 29 U.S.C. § 203(m); 29 C.F.R. § 531.50. The credit allowed on account of tips may be less than 50 percent, but it cannot be more. Determination of the actual amount of the wage credit is, however, left by the statute to the employer based upon his information concerning the tipping practices and receipts in his establishment. 29 C.F.R. § 531.59. In this connection, minimal record-keeping is imposed by the Act and regulations promulgated pursuant thereto upon an employer who seeks to claim a wage credit resulting from tips. 29 U.S.C. § 211(c) requires employers to maintain such records of employees' wages, hours and working conditions as the Secretary of Labor may direct. 29 C.F.R. § 516.28, promulgated by the Secretary, provides that an employer shall maintain payroll or other records containing the following information regarding each tipped employee whose wages are determined under Section 3(m) of the Act:

"(1) A symbol or letter placed on the pay records identifying each employee whose wage is determined in part by tips.

"(2) Weekly or monthly amount reported by the employee, to the employer, of tips received (this may consist of reports made by the employees to the employer on IRS Form 4070).

"(3) Amount by which the wages of each tipped employee have been deemed to be increased by tips as determined by the employer (not in excess of 50 percent of the applicable statutory minimum wage). The amount per hour which the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.

* * * * * *

"(5) Hours worked each workday in occupations in which the employee receives tips, and total daily or weekly straight time earnings for such hours."

For obvious reasons, the Act does not require that an employer be bound by an employee's report as to the amount of tips received, nor is an employee bound by the amount determined by an employer as a wage credit. While employers are entitled as a matter of law to make the initial determination of the amount the wages of their employees are to be increased on account of tips, the statute provides relief in the case of an employee who can show to the satisfaction of the Secretary that the actual amount of tips received by him was less than the amount determined by his employer as a wage credit. 29 U.S.C. § 203(m); 29 C.F.R. § 531.59. Provision is made in 29 C.F.R. § 531.7 for review by the Wage and Hour Division of tip credit determinations made by employers, in the event an employee considers that the tip credit taken exceeds the tips he actually received.

█ █ █ It is quite clear that the sums received by plaintiffs in addition to wages constitute "tips" within the meaning of the statute, as the payments are made by passengers of the limousine service as a gift or gratuity in recognition of services rendered and are in addition to and clearly distinguishable from the regular charge imposed for the transportation. All such payments received by each plaintiff were his to keep and use in any manner he chose, free of any control by the defendant. It is, however, undisputed that neither defendant nor any of the plaintiffs kept any record of tips received, and it would therefore be purely speculative to determine that any plaintiff received at least $20 a month in tips customarily and regularly during the period of his employment. Plaintiffs testified that they were never told to report the amount received in tips to defendant and that they consequently kept no records, but each was of the opinion that he regularly received less

than $20 a month in tips. On the other hand, defendant, who drove a limousine-bus during periods of peak business, and five other full or part time drivers testified as to the sums received by them as tips, and, summarized briefly, they contended that from 60–75 percent of the passengers tipped and that an average tip ranged between $.30 and $.75. However, the defendant and the drivers who testified in his behalf began keeping account of their tips only after the present action was filed, and the results of their investigation can have little relation to the period of employment of plaintiffs. In addition, no witness on behalf of defendant was able to aid the court with documentary evidence of individual tip receipts. In any event, it seems quite clear that the court may not infer that plaintiffs are tipped employees merely because they are or were part of a group which has a record of receiving more than $20 a month in tips. 29 C.F.R. § 531.56(c). Most important, defendant made no attempt to keep the records required by Section 11(c) of the Act. It is perhaps true that defendant did not anticipate the need of accurate record-keeping, but the penalty for such an omission must fall upon the employer and not upon his employees. Anderson v. Mt. Clemons Pottery Co., (1946) 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Mitchell v. Williams, (8 Cir. 1969) 420 F.2d 67; Wirtz v. First State Abstract and Insurance Co., (8 Cir. 1966) 362 F.2d 83. The present action provides persuasive illustration of the policy considerations underlying the requirement that an employer who claims a tip credit make a regular determination of the amount of such credit and report to an affected employee in writing each time the amount claimed is changed from the amount per hour taken in the preceding week. See 29 C.F.R. § 516.28, supra. In that manner, both parties are quickly apprised of a difference of opinion and may rely upon the good offices of the Wage and Hour Division to resolve the dispute before memories fade and records disappear. The court must here conclude that plaintiffs are not tipped employees within the meaning of the Act.

The Act also provides that the "wage" paid to any employee includes the reasonable cost to the employer of furnishing the employee with board, lodging or other facilities, if such facilities are customarily furnished by the employer to his employees. 29 U.S.C. § 203(m). It is clear that some of the plaintiffs were furnished uniforms to wear in the course of their employment, and each plaintiff was allowed to drive and make use of the vehicle assigned to him in the course of his employment after working hours. Each plaintiff was told when he began working for defendant that he would be allowed to take the limousine he drove during working hours home with him at the end of his shift and would then be expected to drive it to work on the next day. Each of the plaintiffs *occasionally* used the limousine for personal errands, and each drove his vehicle to and from work. Plaintiff provided all of the expenses of operation and maintenance of the vehicles, the reasonable cost of which he estimated to be one dollar per day per vehicle.

██ It seems obvious that the nature of defendant's business is such that any uniforms furnished plaintiffs were primarily for the benefit and convenience of defendant and do not fall within the meaning of "other facilities." There has, of course, been no determination by the Wage and Hour Division of the reasonable cost to defendant of furnishing plaintiffs with after-hours use of a work vehicle, and the court clearly cannot accept defendant's completely unsubstantiated estimate of his costs in violation of the record-keeping provisions of the Act. See 29 C.F.R. §§ 516.27, 531.1–4, 531.32, 531.33.

 On October 12, 1968, prior to the filing of the present action, plaintiff Bingham executed a release agreement with defendant, by the terms of which Bingham surrendered any claim that he might have had for unpaid wages

under the Act in exchange for the sum of $500.00. Bingham never negotiated the check tendered as consideration for the release and now contends the agreement violates the public policy underlying the Act and is invalid. The court agrees that the purposes of the Act would be nullified if employers were allowed to diminish their liability by persuading employees to release their right to recover unpaid wages and liquidated damages according to the Act in consideration of receiving payment of a sum less than that provided for by law. D. A. Schulte, Inc. v. Gangi, (1946) 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114; Brooklyn Sav. Bank v. O'Neil, (1945) 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, reh. den. 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005; Caserta v. Home Lines Agency, Inc., (2 Cir. 1960) 273 F.2d 943; Mitchell v. Sky Top Coal Co., (E.D.Pa.1960) 181 F.Supp. 899. In addition, and apart from any possible dispute as to coverage of the Act, defendant was not. at the time the release was executed, in possession of any objective information which could possibly give rise to a bona fide dispute as to the amount due Bingham in unpaid wages, as defendant could clearly only speculate as to any sums Bingham might have received in tips during the period of his employment. The court concludes that the release is invalid.

Plaintiffs were compensated at the rate of $1.00 per hour for all hours worked in each work week during the periods of their employment. The present action was commenced on November 5, 1968, and any claims of plaintiffs that accrued prior to November 5, 1966, are barred by the applicable statute of limitations. 29 U.S.C. § 255(a). But, plaintiffs are entitled to compensation at the rate of $1.25 an hour for any hours worked from November 5, 1966, to February 1, 1967; from February 1, 1967, to February 1, 1968, plaintiffs are entitled to compensation at the rate of $1.40 an hour for any hours worked; and from February 1, 1968, until they left the employ of defendant, plaintiffs are entitled to compensation at the rate of $1.60 an hour for any hours worked.

Defendant's payroll records, while not in strict compliance with the record-keeping provisions of 29 C.F.R. § 516.2, allow the court to determine the hours worked by plaintiffs without resort to speculation and conjecture. Each employee called in from the limousine he drove by radio to defendant's dispatcher each morning on his way to work. The dispatcher would then indicate on a ticket the date and time that each employee called in. At the end of his work day, each employee would bring the day's receipts to the dispatcher's office, where the employee's report of passengers hauled was checked against his receipts and the report was stamped with a time clock. These records were taken daily to defendant's bookkeeper, who used them as his sole source from which he determined the number of hours worked each week by each plaintiff. When the employees were paid at the end of each week, they were given a separate slip which reflected all deductions required by law. Defendant contends, however, that one hour per day should be deducted from the hours each plaintiff worked for the reason that each was allowed a bona fide meal period during each work day, for which no adjustment was made in either the record of hours worked or in gross pay received. Although there was no agreement between plaintiffs and defendant that plaintiffs were to have a meal period at a fixed time during working hours, it is clear that plaintiffs each took time to eat each day during periods of inactivity and that they were not *required* by defendant to perform any duties while eating. See 29 C.F.R. § 785.19 and cases there cited. However, there is absolutely no evidence in the record as to the amount of time regularly taken by plaintiffs as a meal period, and defendant's only instructions were to eat lunch when time was available. In addition, defendant's payroll records, while sufficient to indicate the total number of hours worked by plaintiffs in any work week, do not reflect the number

of days plaintiffs worked per week. The court is therefore left without a reasonably accurate means of determining the amount of time taken daily by plaintiffs as a meal period and no deduction from working time will be allowed.

After a full and thorough consideration of all the evidence, including all available records, the court is convinced and finds that plaintiffs are entitled to severally recover the following sums for unpaid minimum wages and liquidated damages pursuant to 29 U.S.C. § 216(b):

Hershel Lambert—$1,130.12, with interest from this date at six percent;

Jim Bingham—$3,396.14, with interest from this date at six percent;

Richard Glover—$3,671.64, with interest from this date at six percent;

Bill Bridges—$4,031.44, with interest from this date at six percent.

In addition, the plaintiffs are entitled to jointly recover $500.00 as a reasonable attorney's fee.

A judgment in accordance with the above is being entered today against Donald H. Bridges, d/b/a Airport Limousine Service.

Costs will be taxed against defendant.