Paul R. NEWHOUSE, Jr., Suki R. Kuresa and Elwin L. Adarna, Plaintiffs,

v.

ROBERT'S ILIMA TOURS, INC., Defendant.

Civ. No. 75–0271.

United States District Court, D. Hawaii.

Sept. 25, 1981.

Susan M. Ichinose, Mukai, Ichiki, Raffetto & MacMillan, Honolulu, Hawaii, for plaintiffs.

Barry W. Marr, Torkildson, Katz, Jossem & Loden, Honolulu, Hawaii, for defendant.

## DECISION AND ORDER AFTER REMAND

SAMUEL P. KING, Chief Judge.

After cross appeals, the Ninth Circuit Court of Appeals remanded this case "for consideration of the extent to which plaintiffs' claims are cognizable under the Fair Labor Standards Act or the Hawaii Wage and Hour Law" and "for reconsideration of attorneys' fees as well."

The appellate court noted that "if the employees during the relevant period were subject to the overtime provisions of the Fair Labor Standards Act, then the district court's judgment should be affirmed." The defendant had argued that these employees were subject to the provisions of the Motor Carrier Act of 1935 (hereinafter MCA), 49 U.S.C. § 304, and thus were not within the overtime provisions of the Fair Labor Standards Act of 1938 (hereinafter FLSA). *See, e. g., Bingham v. Airport Limousine Service*, 314 F.Supp. 565 (W.D.Ark.1970). Plaintiffs had responded that a "regulation" of the Interstate Commerce Commission (hereinafter ICC), found at 49 C.F.R. Part 1050 (1980), exempted Hawaii from the safety provisions of the MCA, or, in the

alternative, that defendant was not engaged in interstate commerce within the meaning of the MCA and was therefore subject either to the FLSA or to the Hawaii Wage and Hour Law. Defendant had rejoined that the ICC "regulation" was ineffective after the establishment of the Department of Transportation (hereinafter DOT) on April 1, 1967.

▮ Plaintiffs no longer contend that defendant or these employees were not engaged in interstate commerce within the meaning of the MCA. Defendant's operation involved pre-booked tours of out-of-state tourists, pre-arranged transfer of arriving passengers and their baggage from Honolulu International Airport to their ultimate destinations at Waikiki Hotels, and similar activities. The plaintiff-drivers operated defendant's buses in carrying out these activities. The MCA would ordinarily clearly be applicable. *See Bingham v. Airport Limousine Service, supra.*

However, in 1960 and at a time when the MCA was being administered by the ICC, the ICC exempted Hawaii from that act's provisions. Motor Carrier Operations in the State of Hawaii, 84 M.C.C. 5 (1960). The ICC authority to grant this exemption is found in 49 U.S.C. § 304(a)(4a), derived from Act of September 18, 1940, § 19, and since repealed by Pub.L. 95–473, § 4(b), October 17, 1978, 92 Stat. 1466. The relevant portion of the applicable section read as follows:

(a) It shall be the duty of the [Interstate Commerce] Commission . . . .

(4a) To determine, upon its own motion, or upon application by a motor carrier, a State board, or any other party in interest, whether the transportation in interstate or foreign commerce performed by any motor carrier or class of motor carriers lawfully engaged in operation solely within a single State is in fact of such nature, character, or quantity as not substantially to affect or impair uniform regulation by the Commission of transportation by motor carriers engaged in interstate or foreign commerce in effectuating the national transportation policy declared in this Act. Upon so finding, the Commission shall issue a certificate of exemption to such motor carrier or class of motor carriers which, during the period such certificate shall remain effective and unrevoked, shall exempt such carrier or class of motor carriers from compliance with the provisions of this chapter, and shall attach to such certificate such reasonable terms and conditions as the public interest may require. At any time after the issuance of any such certificate of exemption, the Commission may by order revoke all or any part thereof . . . . No certificate of exemption shall be denied, and no order of revocation shall be issued, under this subparagraph, except after reasonable opportunity for hearing to interested parties . . . . In any case where a motor carrier has become exempt from the provisions of this chapter as provided in this subparagraph, it shall not be considered to be a burden on interstate or foreign commerce for a State to regulate such carrier with respect to the operations covered by such exemption . . . .

It is to be noted that the 4a exemption is granted by a "certificate" and not by a formal regulation, and that a public hearing is required only if an application for the exemption is to be denied or an exemption previously granted is to be revoked.

Twelve years later, the ICC revoked the 4a exemption as it applied to carriers of household carriers. Motor Carrier Operations in the State of Hawaii, 115 M.C.C. 228 (1972). The validity and breadth of this action may be doubted in light of the intervening establishment of the DOT and the transfer to the DOT of the ICC's authority over safety of motor carrier operations. This need not be decided here as the revocation did not affect the operations of defendant.

In 1966 Congress passed the Department of Transportation Act (hereinafter DOTA), Pub.L.No. 89–670, 80 Stat. 931 (1966) (codified at 49 U.S.C. §§ 1651–1659 (1976)), which provided that "all functions, powers, and duties of the Interstate Commerce Commission" with regard to the hours and

safety provisions of the MCA would be transferred from the ICC to the DOT. The Act became effective on April 1, 1967. Executive Order 11,340, March 30, 1967, pursuant to Pub.L. 89–670, sec. 15, 80 Stat. 950.

Section 12 of the DOTA specifically provided that "all orders, declarations, rules, regulations, permits, contracts, certificates, licenses, and privileges" which were in effect before the transfer of functions to the DOT and which related to those functions would continue in force until set aside by the DOT or terminated by operation of law or by order of court. 80 Stat. 949.

In 1974 the DOT took specific notice of the certificate exempting Hawaii, discussed the history of the exemption and the then current situation, and revoked the exemption. 39 Fed.Reg. 27,439–27,443 (1974) (codified at 49 C.F.R. Part 390). The operative language appears at 39 Fed.Reg. 27,442, as follows:

> So much of the certificate of exemption found in 49 C.F.R. Part 1050 as applies to compliance with the Federal Motor Carrier Safety Regulations by common carriers by motor vehicle operating within the State of Hawaii, contract carriers by motor vehicle operating in the State of Hawaii, and private carriers of property by motor vehicle operating in the State of Hawaii is hereby revoked, effective on the dates specified below.

The effective date for those regulations relating to Hours of Service of Drivers as set forth in 49 C.F.R. Part 395 (except § 395.8) was given as October 1, 1974. 39 Fed.Reg. 27,443.

■ The periods of employment of plaintiffs herein were as follows:

| | |
|---|---|
| KURESA | 4–1–73 to 11–18–74 |
| ADARNA | 8–20–71 to 11–30–74 |
| NEWHOUSE | 3–1–67 to 2–5–75 |

From and after October 1, 1974, their hours of service were governed by the MCA. Where the MCA applies, the FLSA does not apply. *Bingham v. Airport Limousine Service, supra.* Thus, the awards set forth in the Findings of Fact and Conclusions of Law filed herein on August 28, 1979, must be reduced by so much thereof as relate to

periods after September 30, 1974. This calculation has been made. The reductions are as follows:

| | | |
|---|---|---|
| KURESA | – | $ 254.53 |
| ADARNA | – | $ 242.37 |
| NEWHOUSE | – | $ 992.25 |

■ The foregoing assumes that, during any period when the MCA did not apply to defendant and these employees, the FLSA would apply. The parties concede that defendant and these employees are sufficiently connected to interstate commerce to come within the provisions of both the MCA and the FLSA. The statutory connection to interstate commerce for purposes of the MCA is more narrowly defined than for purposes of the FLSA so that, if there is sufficient connection for the former, there is clearly sufficient connection for the latter, while the reverse may not be true. *See, e. g., Marshall v. Victoria Transp. Co., Inc.,* 603 F.2d 1122 (5th Cir. 1979).

Defendant seeks to avoid this result by arguing that (1) the original exemption did not apply to hours of service of drivers, (2) the exemption as to matters of safety was rendered inoperative by the transfer of functions to the DOT, (3) the exemption did not activate the FLSA.

The argument that the original exemption did not apply to hours of service is based upon a notation under 49 C.F.R. § 1050.1 (1980) that this section was derived from "32 FR 20049, Dec. 20, 1967" which was almost nine months after authority over such matters with respect to carriers subject to the MCA was transferred to the DOT. However, the original exemption was actually granted by a certificate issued in 1960, 84 M.C.C. 5 (1960). That certificate was issued in accordance with all then applicable procedural requirements.

The argument that the transfer of functions to the DOT rendered the ICC's 4a exemption inoperative as to matters of safety runs directly contrary to the specific language of the DOTA. Section 12(a) of that Act reads:

> (a) All orders, determinations, rules, regulations, permits, contracts, certificates, licenses, and privileges—

(1) which have been issued, made, granted, or allowed to become effective—

(A) under any provision of law amended by this Act, or

(B) in the exercise of duties, powers or functions which are transferred under this Act,

by (i) any department or agency, any functions of which are transferred by this Act, or (ii) any court of competent jurisdiction, and

(2) which are in effect at the time this Act takes effect,

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or repealed by the Secretary, Administrators, Board, or General Counsel (in the exercise of any authority respectively vested in them by this Act), by any court of competent jurisdiction, or by operation of law.

The continued validity of the Hawaii exemption was recognized by the DOT in the discussion accompanying the action of the Director of the Bureau of Motor Carrier Safety revoking the exemption. At 39 Fed. Reg. 27,440–27,441, the Director states:

Commercial motor carriers operating in interstate or foreign commerce in Hawaii are not now subject to the Federal Motor Carrier Safety Regulations. This is the case because in 1960, the Interstate Commerce Commission, acting pursuant to section 204(a)(4a) of the Interstate Commerce Act, issued a certificate of exemption which exempted motor carriers operating solely in Hawaii from application of both the economic and safety regulations which the Commission then administered under Part II of the Act. Motor Carrier Operations in the State of Hawaii, 84 M.C.C. 5 (1960). . . . 12 years later, the Commission found . . . factors had radically changed. . . . Motor Carrier Operations in the State of Hawaii, 115 M.C.C. 228, 249 (1972). In its 1972 proceeding, the Commission did in fact revoke the section 204(a)(4a) exemption from economic regulation for motor carriers of household goods in Hawaii.

In the interval between the first and second of the above-mentioned decisions of the Commission, Congress enacted the Department of Transportation Act. The Act transferred the Commission's jurisdiction over motor carrier safety matters to the Department of Transportation, 49 U.S.C. 1655. It also provided for the continued existence, after the transfer of all exemptions from safety regulation which had been issued by the Interstate Commerce Commission until such time as the Department acted to revoke those exemptions. Section 12, Department of Transportation Act, 80 Stat. 931, 949 (1966). Hence, the section 204(a)(4a) exemption from safety regulation remained in effect as to all Hawaiian motor carriers notwithstanding the Commission's 1972 decision.

Up to October 1, 1974, therefore, the Hawaii exemption was valid and in full force and effect with respect to regulation of hours of service of drivers of motor carriers subject to the MCA.

Nevertheless, defendant argues that exemption from the MCA does not mean that the maximum hours provision of the FLSA applies. This argument is based upon section 13 of the FLSA, specifically 29 U.S.C. § 213(b)(1), which read as follows:

(b) The provisions of section 207 [maximum hours] of this title shall not apply with respect to—

(1) any employee with respect to whom the Interstate Commerce Commission [amended by the Department of Transportation Act to read "Secretary of Transportation"] has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49 [relating to regulation of motor carriers]. . . .

It is to be noted that this exemption from the maximum hours provisions of the FLSA applies if the power to establish qualifications and maximum hours exists in the Secretary of Transportation and whether or not this power has actually been exercised. This proposition was enunciated in *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92

L.Ed. 44 (1947). The Supreme Court there said, at 434, 68 S.Ct. at 137:

> We hold that the Commission has the *power* to establish qualifications and maximum hours of service, pursuant to the provisions of § 204 of the Motor Carrier Act, for the entire classification of petitioner's drivers and "mechanics" and it is the existence of that power (rather than the precise terms of the requirements actually established by the Commission in the exercise of that power) that Congress has made the test as to whether or not § 7 of the Fair Labor Standards Act is applicable to these employees.

*Southland Co. v. Bayley*, 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (1943), had earlier held that the exemption from the maximum hours provisions of the FLSA, by § 13(b)(1), of any employee with respect to whom the ICC "has power" under § 204 of the MCA to establish maximum hours of service, became effective immediately as to those employees of private carriers of property by motor vehicle with respect to whom § 204(a)(3) gave the Commission the power to establish maximum hours of service "if need therefor is found," and did not become effective only from the later date when the Commission exercised the power.

Defendant's argument therefor has a surface attractiveness. But the Hawaii situation is unique and requires further analysis. Here the power to establish maximum hours of service as authorized by 49 U.S.C. § 304(a)(3) was exercised in 1960 by issuance of the certificate of exemption as authorized by 49 U.S.C. § 304(a)(4a)

The relevant portions of the original exemption read as follows:

> It is hereby certified that transportation in interstate or foreign commerce performed by all qualified motor carriers lawfully engaged in operation solely within the State of Hawaii is in fact of such nature, character or quantity as not substantially to affect or impair uniform regulation by the Commission of transportation by motor carriers engaged in interstate or foreign commerce in effec-

tuating the national transportation policy; Provided, however, That if the State of Hawaii makes a determination of the intrastate operating rights of the respective motor carriers, the exemption granted herein shall not be construed as exempting operations in interstate or foreign commerce any more extensive than those corresponding to the respective intrastate authorities granted by the State.

Motor Carrier Operations in the State of Hawaii, 84 M.C.C. 5 (1960), 32 Fed.Reg. 20049 (Dec. 20, 1967), 49 C.F.R. Part 1050 (1971).

The effect of this certificate was to exempt all qualified motor carriers lawfully engaged in operation solely within the State of Hawaii from compliance with the provisions of Chapter 8 of Title 49 (the Motor Carrier Act, codified at 49 U.S.C. §§ 301–327, and cited as Part II of the Interstate Commerce Act) during the period the certificate remained effective and unrevoked (from 1960 to 1974). *See* discussion *supra.*

This is not a situation where concurrent jurisdiction of the Secretary of Labor under the FLSA and of the Secretary of Transportation under the MCA is being asserted. The case law is clear that such concurrent jurisdiction is not permissible under the provisions of these two acts; the MCA takes precedence. *Levinson v. Spector Motor Co.*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1946); *Morris v. McComb, supra.* Under certain fact situations, the MCA may apply during one work week, and the FLSA during another work week. *See Crooker v. Sexton Motors, Inc.*, 469 F.2d 206 (1st Cir. 1972). Such a situation might arise as to an employee who does drive a truck in the transportation of property in interstate or foreign commerce during one week but not during the succeeding week. *Id.* at 210. And just as the MCA yields to the FLSA during a work week in which a driver does not engage in any activities affecting motor vehicle safety, so might it yield to the FLSA during any period covered by a certificate of exemption from the MCA issued by competent authority.

The Supreme Court mentioned this possibility in *Morris v. McComb*, 332 U.S. 422 at 436–437, 68 S.Ct. 131 at 138, 92 L.Ed. 44 (1947):

> Congress furthermore has provided a special procedure by which, in an appropriate case, an *intrastate motor carrier* or any other party in interest, may secure the general exemption of such a carrier from compliance with the Motor Carrier Act even though such carrier does perform some interstate transportation. Congress, however, expressly has authorized the Commission, and not the courts, to decide when the case is an appropriate one for such a general exemption. It does not appear that any such certificate of exemption has been obtained or sought as to this petitioner.

Accordingly, I find and conclude that, as to these plaintiffs and during the periods August 4, 1972 (three years prior to the filing of the complaint) to October 1, 1974 (the effective date of revocation of the 4a exemption), the FLSA did apply and the MCA did not apply, and that from and after October 1, 1974, the MCA did apply and the FLSA did not apply.

Because the earlier judgment had carried the overtime calculations past September 30, 1974, certain adjustments are necessary by way of reductions as set forth earlier herein. The revised awards to these plaintiffs are therefore as follows:

| | |
|---|---|
| ADARNA | $ 2,649.05 |
| KURESA | $ 2,800.22 |
| NEWHOUSE | $ 7,392.00 |

Each award shall be together with interest at the rate of 6% per annum from August 4, 1975 (the date of filing of the complaint), to the date of judgment.

As stated in the earlier findings and conclusions, plaintiffs are entitled to recover their reasonable attorneys' fees and costs. An earlier attorney has a lien for attorney's fees of $800 and an award of costs of $250. The $800 would be added to a retainer of $500 paid by plaintiffs for a total initial attorney's fee covering the first eleven months of this action of $1,300. This is certainly a very modest fee and cost bill for preparing and filing the complaint and engaging in numerous conferences and in relevant research. The earlier attorney's affidavit clearly justifies at least 20 hours of time and an hourly rate of at least $75. Accordingly, it is not necessary to discuss more remote factors set out in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975), *cert. denied sub nom. Perkins v. Screen Extras Guild, Inc.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

The attorneys who took over this case in July 1976 requested $19,500 in attorney's fees and $339.95 in costs following the first trial. This court awarded these attorneys $7,500 in attorney's fees and the costs as requested. That award was remanded for reconsideration with the admonition that "district courts are required to consider the factors listed" in *Kerr, supra.* The attorneys have renewed their earlier request for fees of $19,500 through the original trial, and requested, for appeal and post-remand legal services, additional costs of $916.53 and additional fees of $17,615.72. This makes applications of costs totaling $1,506.48 and of attorneys' fees totaling $38,415.72.

The requested costs are substantiated and allowable and are allowed. The sum of $1,506.48 is made up of $250 costs to the original attorney, $339.95 to the present attorneys for costs through the original trial, and $916.53 costs to the present attorneys for costs on appeal and post-remand proceedings.

The attorneys' fees requested are substantial. The times for the several attorneys as set forth in the affidavits were all reasonably expended in pursuing plaintiffs' claims. The issues became unusually complex; the defendant, convinced of the correctness of its position, became unusually stubborn. Even after remand, the applicable law has been vigorously debated.

The hourly rates requested for the several attorneys are reasonable. For appeal and post-remand services, one attorney requests $140 per hour, but for only 13.2 hours. The attorney who has carried the principal burden of this litigation requests

326

only $75 per hour, a usual going rate for relatively experienced attorneys in this district.

The results obtained have been favorable to plaintiffs. The legal issues have been novel.

On the other hand, an hour-by-hour or minute-by-minute determination with a calculator applying reasonable hourly rates is a mechanical approach which, in this case, leads to an unfair conclusion. *See Manhart v. City of Los Angeles, Dept. of Water, Etc.*, 652 F.2d 904 (9th Cir. 1981).

Balancing all factors mentioned in *Kerr, supra,* I find that attorneys' fees in the total amount of $25,000 would be fair and reasonable. This includes $800 to the original attorney, $500 to repay plaintiffs for the retainer paid to the original attorney, and $23,700 to the present attorneys.

The foregoing constitute the court's findings of fact and conclusions of law on remand.

The clerk shall enter judgment accordingly.