893 P.2d 779

Richard HEATHERLY, Byron Hiyane, Robert Kong, Burt Kubota, Raymundo Lived, Phillip Losalio, Godfrey Maeshiro, Dennis Nakashima, Howard Taka, Lawrence Takara, Howard Yamane, individually and on behalf of those similarly situated; and Anthony Rutledge, as designated agent on behalf of designating persons and those similarly situated, Plaintiffs–Appellants,

v.

HILTON HAWAIIAN VILLAGE JOINT VENTURE, dba Hilton Hawaiian Village Hotel; WKH, Inc., dba Kahala Hilton Hotel; Pleasant Travel Services, Inc., dba Kona Hilton; Kyo–Ya Company, Ltd. Hotel Division, dba Moana/Surfrider Hotels, Princess Kaiulani Hotel, Royal Hawaiian Hotel, Sheraton Waikiki Hotel, and Sheraton Maui Hotel; Ohbayashi Hawaii Corp., dba Sheraton Kauai Hotel; Jowa Hawaii, Inc., dba The Ilikai; and Azabu U.S.A., Inc., dba Hyatt Regency Waikiki; Council of Hawai'i Hotels; and William C. Crawford, in his capacity as Executive Director of Council of Hawaii Hotels; Defendants–Appellees.

No. 16929.

Supreme Court of Hawai'i.

April 26, 1995.

As Amended on Partial Grant of Reconsideration May 17, 1995.

T. Anthony Gill of Gill & Zukeran, Honolulu, for plaintiffs-appellants.

Richard M. Rand (Robert S. Katz with him on the brief; of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington), Honolulu, for defendants-appellees.

Before MOON, C.J., KLEIN, LEVINSON and NAKAYAMA, JJ., and HEELY, Circuit Court Judge, in place of RAMIL, J., recused.

KLEIN, Justice.

The plaintiffs-appellants (the Bellhelp) are all bellhops of various hotels located throughout Hawai'i, with the exception of Anthony Rutledge (Rutledge), who is the Financial Secretary/Treasurer of Hotel Employees and Restaurant Employees, Local 5 (Local 5). The defendants-appellees (the Hotels) are hotels, or companies that own the hotels, which employ the Bellhelp.

The Bellhelp appeal from the first circuit court judgment, filed February 16, 1993, granting the Hotels' motion for summary judgment or in the alternative for partial summary judgment. The circuit court determined that porterage fees transmitted to the Bellhelp constitute wages within the meaning of Hawai'i Revised Statutes (HRS) § 387–1

(1985 & Supp.1992);[1] therefore, these amounts can be used to satisfy the Hotels' obligation under HRS § 387–2 (Supp.1992)[2] to pay minimum wages.

On appeal, the Bellhelp claim that the circuit court erred in (1) determining that porterage fees are wages under HRS § 387–1 and (2) granting summary judgment where a genuine issue of material fact existed as to whether the term "gratuities of any kind," as used in HRS § 387–1, includes porterage fees.

For reasons set forth below, we vacate the circuit court's judgment.

## I. BACKGROUND

The Hotels, through their bargaining representative, the Council of Hawaii Hotels, and Local 5 are parties to a collective bargaining agreement (Master Agreement), which establishes the wage rates for the Bellhelp. According to the Bellhelp's Opening Brief, the Bellhelp's total income derives from three sources: (1) an hourly wage pursuant to the Master Agreement; (2) tips from hotel guests; and (3) "porterage," a third category that is the subject of dispute in this case.

The Bellhelp brought this action on June 15, 1992 seeking recovery of unpaid minimum wages pursuant to HRS § 387–12(b) (1985).[3]

It is undisputed that between the settlement of the Master Agreement, in 1990, and April 1, 1992, the Bellhelp's wages, as set forth in the Master Agreement, exceeded both the federal and Hawai'i minimum wage. On April 1, 1992, however, the Hawai'i minimum wage was raised from $3.85 to $4.75 per hour and, effective January 1, 1993, the minimum wage was raised to $5.25 per hour. HRS § 387–2. In their complaint, the Bellhelp asserted that as of April 1, 1992 the Hotels have not adjusted the Bellhelp's wages to satisfy the Hawai'i minimum wage requirement.

On July 6, 1992, the Hotels filed their answer; then, on November 9, 1992, the Hotels filed a motion for summary judgment or in the alternative for partial summary judgment. The Hotels asserted that they were entitled, as a matter of law, to count both the contractual hourly wages and the porterage to meet the minimum wage requirements of HRS chapter 387. In their memorandum opposing the Hotels' motion, the Bellhelp claimed that pursuant to the Master Agreement, porterage could not be counted as wages because porterage fees are "not [the] employers' money to award or allocate or pay" under HRS § 387–1. *See also* HRS § 387–2 (calling for "pay[ment]" of wages).

1. HRS § 387–1 provides in pertinent part:
   *Definitions.* As used in this chapter:
   "Wage" means (except as the department may provide under section 387–11) legal tender of the United States or checks on banks convertible into cash on demand at full face value thereof and in addition thereto the reasonable cost as determined by the department, to the employer of furnishing an employee with board, lodging, or other facilities if such board, lodging, or other facilities are customarily furnished by such employer to the employer's employees. *Except for the purposes of the last sentence of section 387–2, "wage" shall not include tips or gratuities of any kind.*
   (Emphasis added.) HRS § 387–11 (1985) permits the Department of Labor and Industrial Relations to promulgate rules and regulations defining terms used in this chapter; however, the department's definitions may not be used to limit the generality of the terms.

2. HRS § 387–2 provides:
   Except as provided in section 387–9 and this section, every employer shall pay to each employee employed by the employer wages at the rate of not less than $3.85 per hour beginning

January 1, 1988, $4.75 per hour beginning April 1, 1992, and $5.25 per hour beginning January 1, 1993. The hourly wage of a tipped employee may be deemed to be increased on account of tips if the employee is paid not less than twenty cents below the applicable minimum wage by the employee's employer and the combined amount the employee receives from the employee's employer and in tips is at least fifty cents more than the applicable minimum wage.
   HRS § 387–9 (1985) concerns special minimum wage requirements for people such as students, apprentices, and those with handicaps and, therefore, is not applicable in this appeal.

3. HRS § 387–12(b) (1985) provides:
   Liability to employee. Any employer who violates any provision of sections 387–2 and 387–3 shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or unpaid overtime compensation, and in case of wilful violation in an additional equal amount as liquidated damages.

By order entered on January 28, 1993, the circuit court granted the Hotels' motion for summary judgment or in the alternative for partial summary judgment. In this order, the circuit court stated: "The Court finds that the service charges are wages under H.R.S. § 387–1 and therefore can be used by Defendants in their entirety to satisfy their obligation to pay the minimum wage established by H.R.S. § 387–2." The circuit court's judgment was entered on February 16, 1993.

On March 15, 1993, the Bellhelp timely filed their notice of appeal.

## II. *STANDARD OF REVIEW*

On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. *Sentinel Ins. Co. v. First Ins. Co. of Hawai'i*, 76 Hawai'i 277, 287, 875 P.2d 894, 904 (1994). In other words, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Pacific Int'l Services Corp. v. Hurip*, 76 Hawai'i 209, 213, 873 P.2d 88, 92 (1994); Hawai'i Rules of Civil Procedure 56(c) (1990).

## III. *DISCUSSION*

The essence of the Bellhelp's argument is that, by contract, porterage fees cannot be considered wages paid by the Hotels because these monies represent a form of dual compensation, like gratuities, that are owned exclusively by the Bellhelp. The Bellhelp contend that because the Master Agreement § 38.5(A)(1) provides that "porterage ... shall be considered the *exclusive property* of the bargaining unit employees and are payable only to the appropriate bargaining unit employees," the porterage fees never belonged to the Hotels. (Emphasis added.) Therefore, because the Hotels never owned the porterage fees, they could not "pay" these monies to the Bellhelp as wages in exchange for labor and services rendered under HRS § 387–2.

The Hotels respond that under the terms of the Master Agreement porterage is neither a tip nor a gratuity; therefore, these funds need not be excluded when determining whether the Bellhelp have been paid minimum wages as required by law. In support of their argument, the Hotels note that the Master Agreement defines porterage as "any service charge or pre-negotiated payment by a guest of [sic] a customer for service rendered."[4]

A. *Whether "porterage" constitutes "wages" or "gratuities of any kind" under HRS §§ 387–1 and 387–2 is a genuine issue of material fact.*

Before we consider the parties' apparently divergent interpretations of the Master Agreement, we must construe HRS §§ 387–1 and 387–2 to determine whether these provi-

---

4. Relevant provisions of the Master Agreement concerning porterage include:
SECTION 38. SERVICE CHARGES AND GRATUITIES.
....
*PAYMENT OF GRATUITIES TO THE UNIFORMED SERVICES DEPARTMENT.*
*38.5 General.*
   A. It is understood that the matter of the distribution of gratuities, porterage and charges is vested solely with the Union.
   1. *All gratuities, porterage and charges shall be considered the exclusive property of the bargaining unit employees* and are payable only to the appropriate bargaining unit employees of the Uniformed Services Department, hereinafter referred to as "Bellhelp" unless otherwise indicated.

....
*38.6 Definitions.*
   A. Gratuity/Tip. A gratuity/tip is defined as any gift or payment given by a guest or a customer for service rendered.
   B. Porterage. Porterage is defined as any service charge or pre-negotiated payment by a guest of [sic] a .customer for service rendered.
*38.7 Schedule of Porterage/Gratuities/Charges.*
   A. Porterage. All tours and groups where baggage is handled by Bellhelp as a group movement shall be guaranteed[ ] a porterage.... Effective on March 1, 1992 the porterage amount shall be Two dollars ($2.00) per person for each check-in and Two dollars ($2.00) per person for each check-out.
(Emphasis added.)

sions permit the parties to designate a particular source of income—e.g., "porterage"—as "wages" or "gratuities." "[P]arties may not do by contract what is prohibited by statute." *Lerwill v. Inflight Servs., Inc.*, 379 F.Supp. 690, 696 (N.D.Cal.1974), *aff'd, Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507 (9th Cir.1978).

The circuit court's finding that porterage fees constitute wages under HRS § 387-1 is really a conclusion of law, and questions of statutory interpretation are reviewable *de novo. Crosby v. State*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994).

In *Crosby*, we summarized the applicable standards for statutory interpretation:

> When construing a statute, our foremost obligation "is to ascertain and give effect to the intention of the legislature," which "is to be obtained primarily from language contained in the statute itself." *Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 63, 868 P.2d 1193, 1210, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994) (citations omitted). However,
>
> > we have rejected an approach to statutory construction which limits us to the words of a statute ... for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination.
>
> *Id.* at 68, 868 P.2d at 1215 (Klein, J., dissenting) (citing *Treloar v. Swinerton & Walberg Co.*, 65 Haw. 415, 421, 653 P.2d 420, 424 (1982)).
>
> Thus, the plain language rule of statutory construction,
>
> > does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus,

> > would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.
>
> > *Survivors of Medeiros v. Maui Land & Pineapple Co.*, 66 Haw. 290, 297, 660 P.2d 1316, 1321 (1983)[.]
>
> *Id.* at 68–69, 868 P.2d at 1215–16 (Klein, J., dissenting).

*Crosby*, 76 Hawai'i at 340, 876 P.2d at 1308.

HRS § 387-1 initially defines "wage" as "legal tender of the United States ... and in addition thereto the reasonable cost ... to the employer of furnishing an employee with board, lodging, or other facilities if such board, lodging, or other facilities are customarily furnished by such employer to the employer's employees." *See Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 408, 62 S.Ct. 659, 671–72, 86 L.Ed. 914 (analyzing a similar provision under federal law), *reh'g denied*, 315 U.S. 830, 62 S.Ct. 909, 86 L.Ed. 1224 (1942), HRS § 387-1 then expressly, but qualifiedly, excludes "tips" and "gratuities of any kind" from its definition of wages.

We are aware that the Department of Labor & Industrial Relations Regulations (DLIR) § 12-20-1 clearly distinguishes between the specific kind of gratuity called "tips" and service charges:

> "Tip" means *a sum of money determined solely by a customer and given in recognition of service performed by an employee who retains it as a gift or gratuity.* It may be paid in cash, bank check, or other negotiable instrument payable at par as well as amounts transferred by employer to employee by direction of the credit customer who designates amounts to be added to the customer's bill as tips. *Compulsory or negotiated service charges and special gifts in forms other than described above are not counted as tips.*

(Emphasis added.) [5] Porterage clearly does not constitute tips under DLIR § 12-20-1.

---

**5.** The Code of Federal Regulations (C.F.R.), Title 29, § 531.55 (1994) provides in pertinent part:

(a) A compulsory charge for service, such as 10 percent of the amount of the bill, imposed

on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to his employees, cannot be counted as a tip received in applying the provision of section 3(m) and 3(t).

Because we must assume that the legislature would not enact superfluous language, *see Methven–Abreu v. Hawaiian Ins. Guaranty Co.,* 73 Haw. 385, 392, 834 P.2d 279, 284 (1992) (citing *Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984)), "gratuities of any kind" must be something other than "tips." The DLIR has not defined "gratuities of any kind." In any event, the DLIR is only authorized to define the relevant terms as long as its definitions do not limit the generality of the terms. HRS § 387–11, *supra* note 1.

The dispositive issue in this case, therefore, is whether porterage falls within the general category "gratuities of any kind" under HRS § 387–1. The legislative history of HRS chapter 387 does not provide any direct insights as to the meaning of "gratuities of any kind." Pertinent rules of statutory construction in these circumstances are provided in *In re Taxes, Hawaiian Pineapple Co.,* 45 Haw. 167, 363 P.2d 990 (1961).

There is a further principle *in construing the language of a statute regulating a business it should be given the meaning as understood in the business rather than its ordinary meaning.* In the absence of legislative intent to the contrary, the common meaning will prevail until the commercial or trade meaning is proved. *The trade or commercial meaning is a fact to be proved in each case.* Until such fact is proved, an alleged commercial or trade meaning of a common term is presumed to be the same as the common meaning.

*Id.* at 178–79, 363 P.2d at 997. The trade meaning of "gratuities of any kind" is clearly a "fact" that is material to whether the Hotels are entitled to summary judgment. *See infra* section III.B.[6] Until this issue of fact is resolved at trial, it cannot be determined whether porterage fees are a kind of gratuity or wages within the meaning of HRS chapter 387.

Bearing in mind the admonition in *Lerwill* that "parties may not do by contract what is prohibited by statute[,]" 379 F.Supp. at 696, we find nothing in HRS chapter 387 to preclude the Hotels from agreeing—for the sole purposes of the minimum wage law—not to

---

*Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received....*

(b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. *However, where such sums are distributed by the employer to his employees, they may be used in their entirety to satisfy the monetary requirements of the Act....* 29 C.F.R. § 531.55 (1994) (emphasis added). *See also Cuevas v. Monroe Street City Club, Inc.,* 752 F.Supp. 1405, 1417 n. 18 (N.D.Ill.1990) (noting that, pursuant to 29 C.F.R. § 531.55, service charges are considered wages for determining minimum wage).

**6.** The dissent's conclusion that "the Bellhelp had the opportunity but failed to make a sufficient showing to defeat summary judgment[,]" Dissenting opinion at 22, ignores the uncontested affidavit of Local 5 representative Rutledge. Accepting Rutledge's assertions as true, which we must for the purposes of the Hotels' summary judgment motion, we are led to the conclusion that Local 5 negotiated with the Hotels to construe porterage in light of its historical development as a kind of gratuity—the advent of large group tours contributed to the replacement of tips and gratuities, which were previously provided to the Bellhelp by guests individually, with "Bellmen's Gratuit[ies]" or "porterage gratui-

ties" furnished as a lump sum in recognition of the group service rendered by the Bellhelp for the Hotels' and their guests' convenience. Although the Bellhelp's combined take home pay under the Master Agreement was initially to their satisfaction, circumstances changed when the Bellhelp did not realize expected benefits from the 1992 and 1993 increases in the mandatory minimum wage.

The dissent essentially supersedes the collective bargaining process by judicial fiat, denying the benefits of minimum wage hikes to the Bellhelp and indirectly granting a related benefit to the Hotels. The dissent seeks to justify its decision by attempting to undermine our reading of *Williams v. Jacksonville Terminal Co.,* 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914, *rehearing denied* 315 U.S. 830, 62 S.Ct. 909, 86 L.Ed. 1224 (1942). *See* Dissenting opinion at ———— ———, 893 P.2d at 793. In doing so, however, the dissent implicitly suggests that we missed the fact that "the term 'wages' in the [pre–1966 version of the] FLSA 'ha[d] no fixed meaning either including or excluding gratuities[,]'" *id.* at ———, 893 P.2d at 791, while simultaneously ignoring our citation to *Hayden v. Bowen,* 404 F.2d 682, 686 (5th Cir.1968), *cert. denied,* 395 U.S. 933, 89 S.Ct. 1995, 23 L.Ed.2d 448 (1969), which permitted the employer and its employees to decide how to allocate tips for minimum wage purposes notwithstanding the FLSA's broad definition of "wages." *See infra* note 8 & accompanying text.

treat porterage as revenue.[7]   In other words, the Hotels are not prohibited by HRS chapter 387 from reaching an agreement with Local 5 to (1) collect "porterage" from hotel guests on behalf of the Bellhelp, and then (2) transmit this "exclusive property" of the Bellhelp as an addendum to their paid wages. *Cf. Williams*, 315 U.S. at 397–98, 62 S.Ct. at 666–67 (permitting the opposite arrangement, where gratuities in the form of tips are included in employee wages pursuant to an agreement between the parties); *Hayden v. Bowen*, 404 F.2d at 686 (inferring from *Williams* that tips should be excluded absent such an agreement).[8]

Furthermore, we conclude that the exclusion of porterage from wages under the Bellhelp's interpretation of the Master Agreement, *see infra* section III.B. and *supra* notes 6 and 7, is consistent with the state legislature's intent to ensure that employers pay for labor primarily with their own money. *See* 1969 House Journal, at 703.

7.   The dissent concludes that "there is no practical difference as to whom the parties designate as the owner of the porterage[.]" Dissenting opinion at 20.  Although we recognize, without deciding, that this may be true with respect to other statutory purposes—for example, the amount of state and federal taxes collectively owed by the Hotels and the Bellhelp, an issue which is not presently before the court—the relevant terms of the Master Agreement as understood by Local 5 (and uncontested by the Hotels) have a very real impact on the amount of money taken home by the Bellhelp. *See supra* note 6.  Accordingly, we do not rely upon *St. Paul Hilton Hotel v. Commissioner of Taxation*, 298 Minn. 202, 214 N.W.2d 351 (1974), for the proposition that state taxes may not be imposed upon these porterage payments, or that such amounts may be deducted by the Hotels as paid wages.  However, we do agree with the Minnesota Supreme Court to the extent that it recognizes the practice of negotiating employment agreements that provide for dual compensation in an attempt to reflect customary meaning in a changing marketplace, notwithstanding the superficially appealing distinction between the typical kind of gratuity known as "tips" and pre-negotiated service-charges. *See infra* section III.B. (quoting from *St. Paul Hilton*); Dissenting opinion at 362 n. 3, 893 P.2d at 790 n. 3.

8.   Although *Williams* and *Hayden* are based on a Fair Labor Standards Act provision prior to the amendment that explicitly excluded tips from minimum wage calculations, the ability

The Fair Labor Standards Act permits an employer of a "tipped employee" to claim up to fifty per cent of the employee's minimum wage as coming from tips actually received by him.  Your Committee, however, is not convinced that a credit to the extent permitted by the Federal law would be in the best interests of our workers.  It feels that a tip credit should be permitted only where the employee is receiving a sum in combined wages and tips which is sizably more than the minimum hourly wage.

Hse.Stand.Comm.Rep.  No.  195, in  1969 House Journal, at 703.  Whereas the national tip credit can be as much as fifty percent of federal minimum wage,[9] Hawai'i law only permits a twenty cent tip credit, which amounts to roughly 3.8 percent of the state's minimum wage requirement.[10]   *See* HRS § 387–2, *supra* note 2.  In other words, the legislative history of HRS chapter 387 indicates that employers may satisfy minimum wage requirements by relying on outside sources only to a very limited extent.[11]

to contractually designate ownership of gratuities is consistent with currently applicable regulations. *"In the absence of an agreement to the contrary* between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer." 29 C.F.R. § 531.52 (1994) (emphasis added).

9.   29 U.S.C. § 203(m) provides in pertinent part:
[i]n determining the wage of a tipped employee, the amount paid such employee by his [or her] employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of ... 50 percent of the applicable minimum wage rate ..., except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee.

10.   This figure was determined by dividing the twenty cent tip credit by the applicable minimum wage, which is currently $5.25 per hour.

11.   Among the various sources of authority cited by the dissent to support its conclusion that porterage constitutes wages, *see* Dissenting opinion at 360–362, 893 P.2d at 788–790, only *Beaman v. Westward Ho Hotel Co.*, 89 Ariz. 1, 357 P.2d 327 (1960), and *Cuevas* do not involve the extraneous issue of taxation.  Furthermore, both *Beaman* and *Cuevas* construed state statutes that define wages more broadly than HRS § 387–1:

In appropriate circumstances, therefore, we conclude that porterage may be considered in the nature of "gratuities" for the purposes of HRS § 387–1 and HRS § 387–2. *See Hawaiian Pineapple*, 45 Haw. at 179, 363 P.2d at 997. Consequently, we hold that the Hotels are not entitled to summary judgment as a matter of law.

B. *The trade meaning of "gratuities of any kind" may include "porterage" in this case.*

The Bellhelp argue that evidence in the record supports an inference that a trade meaning of "gratuities" exists and that it includes "porterage"—notwithstanding that porterage is currently collected by the Hotels from certain guests as a service charge or pre-negotiated payment. The Hotels do not contest the evidence provided by the Bellhelp, but simply dismiss it as collectively irrelevant.[12] In other words, the Hotels es-

---

the Arizona minimum wage statute in *Beaman* defines wages as including "remuneration ... *from whatever source* [,]" *see* Dissenting opinion at 361 n. 2, 893 P.2d at 789 n. 2 (emphasis added); although the court in *Cuevas* did not directly address the Illinois minimum wage statute, it defines wages as "compensation due to an employee by reason of his employment, including allowances ... for gratuities and, when furnished by the employer, for meals and lodging actually used by the employee." Ill.Ann.Stat. ch. 48, para. 1003 (Smith–Hurd 1991) (incorporating by reference the forty percent allowance for gratuities under Ill.Ann.Stat. ch. 48, para. 1004 (Smith–Hurd 1991)). We observe that our state legislature knows how to draft broader definitions of the term "wages" for purposes other than determining whether minimum wage requirements have been met. *See, e.g.,* HRS § 383–10 (1992 Supp.) ("all remuneration for services from whatever source" for the purposes of the Hawai'i Employment Security Law); HRS § 386–1 (1985) (including "gratuities received in the course of employment from others than the employer to the extent that they are customary and expected in that type of employment" for the purposes of the Workers' Compensation Law); HRS §§ 388–1 and 388–6 (1985) (including "tips or gratuities of any kind" as wages that may be withheld by employers for specified purposes); HRS § 393–3(9) (1985) ("all remuneration from whatever source" for the purposes of the Prepaid Health Care Act).

The dissent mistakenly believes that the Bellhelp's interpretation of the Master Agreement somehow circumvents Hawai'i minimum wage law by excluding porterage from consideration when computing the Bellhelp's earnings for purposes of HRS §§ 387–1 and 387–2. However, notwithstanding the fact that HRS § 387–4.5 prohibits the contravention or setting aside of the minimum wage law provisions through private agreement, HRS § 387–13 clearly permits employees to bargain collectively through their representatives to achieve total earnings "in excess of" the amount required under chapter 387. The Bellhelp's interpretation of the Master Agreement does not contravene or set aside any obligations under this chapter; it merely forces the Hotels to satisfy the minimum wage requirement

without relying upon porterage fees collected from hotel guests.

12. The Hotels submit that "questions of contract interpretation are for the arbitrator exclusively under both the contract and federal law. *See generally Republic Steel Corp. v. Maddox,* 379 U.S. 650 [85 S.Ct. 614, 13 L.Ed.2d 580] (1965)." The Hotels do not point to any express provision in the Master Agreement that requires arbitration prior to court action. In any event, federal case law and regulations, *see supra* note 8, as well as our decision in *Hawaiian Pineapple,* 45 Haw. at 179, 363 P.2d at 997, implicitly acknowledge the propriety of considering contractual terms in the instant context. We disagree with the dissent's characterization of the Master Agreement as "unambiguous." Dissenting opinion at 364, 893 P.2d at 792. Because we believe that (1) this contract is capable of being reasonably understood in more ways than one, and (2) the parties' intent with respect to the treatment of "porterage" for minimum wage law purposes is a genuine issue of material fact, we conclude that the "extrinsic evidence" provided by the Bellhelp is admissible. *DiTullio v. Hawaiian Ins. & Guar. Co.,* 1 Haw.App. 149, 156, 616 P.2d 221, 226 (1980). In questioning our reliance on *DiTullio,* the dissent starts with the proposition that " 'porterage' and 'gratuity' ... are unambiguously defined in the current Master Agreement." Dissenting opinion at 364 n. 6, 893 P.2d at 792 n. 6. We are aware of the relevant definitions. *See supra* at 353, 893 P.2d at 781 and 781 n. 4. Nevertheless, "[i]n the context of this contract[,]" *DiTullio,* 1 Haw.App. at 155, 616 P.2d at 226—which further establishes that "porterage" is "the exclusive property of the [Bellhelp] and [is] *payable* only to [them]," while also providing that "gratuit[ies]/tips" are, inter alia, *"payment* [s] given[,]" *see* Master Agreement §§ 38–5(A)(1) and 38.6(A) (emphases added)—we cannot conclude, as a matter of law, that the parties mutually intended porterage to be considered *wages paid* to the Bellhelp by the Hotels pursuant to state minimum wage law. *See supra* notes 7 and 11. Because it would be inappropriate to decide this genuine issue of material fact, we merely hold that the Hotels are not

sentially argue that Local 5 agreed to treat "porterage" as wages by defining the term as a service charge or pre-negotiated payment.

It is a fundamental rule in this jurisdiction that "[w]hen making a summary judgment determination, all evidence and inferences to be drawn must be construed in the light most favorable to the nonmoving party." *State Farm Mutual Auto. Ins. Co. v. Fermahin*, 73 Haw. 552, 555, 836 P.2d 1074, 1076 (1992). At first glance, the Master Agreement appears to differentiate between porterage and gratuities in a manner similar to DLIR § 12-20–1 and 29 C.F.R. § 531.55. *See supra* section III.A. Porterage includes "any service charge or *pre-negotiated payment* by a guest [or] customer for service rendered." (Emphasis added.) Master Agreement § 38.6(B), *supra* note 3. Gratuities are defined as "any gift or payment given by a guest or customer for service rendered." *Id.* § 38.6(A), *supra* note 3. Accordingly, upon superficial examination, it would seem logical to conclude that porterage payments are not gratuities because they are neither voluntary nor discretionary.

Nevertheless, the Bellhelp have offered uncontroverted evidence that porterage derives from gratuities and that this historical context was incorporated in relevant agreements after the term "porterage" was coined. For example, the 1976 Master Agreement used the term "porterage gratuities" to define what is now known simply as "porterage." Earlier, section 42.7 of the 1973–75 Master Agreement provided *"Bellmen's Gra-*

*tuity:* Gratuities for handling of baggage by the bell staff for *group movements* shall be seventy-five cents (75 [cents]) per person checking in and seventy-five cents (75 [cents]) per person checking out. Any deviations shall require the prior approval of the Union." (Emphasis added.) The Bellhelp also note that certain of their pay stubs list porterage as "GTR," which they claim is a code for gratuities.

Furthermore, an uncontested affidavit submitted by Rutledge claims that porterage was designed to replace the tips and gratuities lost by the bellhelp with the advent of large tour groups. *See, e.g., St. Paul Hilton,* 298 Minn. at 204–05, 214 N.W.2d at 352 ("The purported distinction between discretionary 'tips' and mandatory 'service charges' squares neither with the statute nor familiar customary meaning in the market place ... [where] the mandatory service charge has evolved as a convenient substitute for the voluntary tip[.]"). Because porterage was intended to replace lost tips and gratuities, the Bellhelp conclude that porterage should be included in the category "gratuity of any kind" and should not be considered wages pursuant to HRS § 387–1.[13]

Given the uncontroverted evidence in this case, it is difficult for us to believe—as the Hotels implicitly argue and the dissent myopically proclaims, *see* Dissenting opinion at 363, 893 P.2d at 791 (stating that the Master Agreement "clearly set[s] forth" the trade meanings of gratuities and porterage as in-

---

entitled to summary judgment as a matter of law.

**13.** In any event, the Master Agreement indicates that porterage retains an element of discretion or voluntariness, unlike typical service charges, because non-prearranged groups who visit the Hotels can choose for themselves whether to be handled as a group, with the convenience of porterage, or individually, under the tip system. Master Agreement § 38.7(A)(1) provides:

When a group arrives at a Hotel that is not a pre-arranged group movement sold by a Hotel, a designated representative of the Hotel or Bell Captain shall ascertain if the guests want to have their baggage handled in the established manner for group movements. If yes, then the contractual handling guarantee shall apply. If not, then the Bellhelp will

be notified and they will know that the guests will be handled in the same manner as individual check-ins.

Furthermore, Rutledge's uncontroverted affidavit contends that hotel guests occasionally demand group service, but nonetheless refuse to pay porterage. In addition to demonstrating the continued element of discretion associated with porterage, these "very rare" circumstances highlight the fact that the Master Agreement contractually obligates the Hotels to pay a guaranteed amount notwithstanding the customers' refusal to provide a gratuity. The resulting payment by the Hotels, which apparently is still called "porterage," constitutes wages for the purposes of HRS §§ 387–1 and 387–2 because handling the baggage as a group movement rather than through individual service does not deprive the Bellhelp of

tended by the negotiating parties)—that collective bargaining between Local 5 and the Hotels could have resulted in an agreement to count porterage as part of the Bellhelp's basic wages for the purposes of state minimum wage law. Construing the available evidence and drawing inferences in the light most favorable to the Bellhelp, *see Fermahin*, 73 Haw. at 555, 836 P.2d at 1076, we conclude that the Master Agreement was intended to ensure that porterage fees collected by the Hotels are distributed to the Bellhelp as a category separate from their basic wages. Consequently, we hold that the Hotels are not entitled to summary judgment because the Bellhelp have raised a genuine issue of material fact as to whether "porterage" is a "gratuity of any kind."

## IV. CONCLUSION

Based on the foregoing analysis, we vacate the circuit court's judgment granting the Hotels' motion for summary judgment and remand for further proceedings consistent with this opinion.

MOON, Chief Justice, dissenting, in which HEELY, Circuit Judge, joins.

Because the majority's analysis disregards the unambiguous distinction between tips or gratuities and service charges or porterage, as reflected by the applicable law and the agreement of the parties, I respectfully dissent. I believe that, under the circumstances of this case, the trial court was correct in its ruling that "service charges [or porterage fees] are wages under HRS § 387–1 and therefore can be used by [the Hotels] in their entirety to satisfy [the Hotels'] obligation to pay the minimum wage established by HRS § 387–2."

### A. *Porterage Is Not Voluntary*

Under the Master Agreement, the terms "gratuity" and "tip" are synonymous. Section 38.6(A) of the Agreement states: "A. Gratuity/Tip. A gratuity/tip is defined as

any gift or payment given by a guest or customer for service rendered." In contrast, "porterage" is defined separately in section 38.6(B) of the Agreement "as any *service charge or pre-negotiated payment* by a guest [or] a customer for service rendered." (Emphasis added.)

It is common knowledge that gratuities, like tips, are *voluntary* payments made or gifts given by patrons in recognition of or appreciation for a particular service. A service charge, on the other hand, is a *predetermined* sum that patrons agree to pay in exchange for a particular service. In this case, the particular service rendered is group baggage service for which porterage, a service charge, is levied.[1] The fact that porterage is a payment *required* of hotel guests who elect to have group baggage service precludes it from being a gratuity. Hotel guests most assuredly would not consider porterage a "gift" that they have freely determined to pay to the Hotels for group baggage service. Furthermore, the Bellhelp render this service to the Hotels as their employers and not to the individual guests. A hotel guest, whose bags are handled as a group, has no discretion regarding the amount of the service charge; however, the guest retains the option of paying a gratuity, in addition to the service charge, if he or she so chooses. Inasmuch as the majority admits that porterage is not a tip, and tips are defined as the equivalent of gratuities, it logically follows that porterage cannot be a gratuity.

My difficulty in following the majority's analysis and interpretation of HRS § 387–1 is due to the majority's apparent misreading of the statute. HRS § 387–1 specifically excludes "tips *or* gratuities of any kind." A plain reading of the statute indicates that tips and gratuities are synonymous, that is, that tips and gratuities are "alternative terms for the same thing." *Random House College Dictionary* 934 (Rev. ed. 1979) ("or" is "used to connect alternative terms for the

potential tips or any other kind of gratuity in these circumstances.

1.    As noted by the majority, the Master Agreement provides that "[a]ll tours and groups where baggage is handled by Bellhelp as a

group movement shall be guaranteed[ ] a porterage.... Effective March 1, 1992 the porterage amount shall be Two dollars ($2.00) per person for each check-in and Two dollars ($2.00) per person for each check-out." *Master Agreement*, § 38.7(A).

same thing"). The majority, however, states that HRS § 387–1 "expressly, but qualifiedly, excludes 'tips' *and* 'gratuities of any kind' from its definition of wages[,]" majority opinion at 354, 893 P.2d at 782 (emphasis added), thereby implying two separate and distinct categories. Consistent with the plain language of HRS § 387–1, the parties to the Master Agreement have clearly demonstrated their understanding and intention to treat tips and gratuities synonymously by defining "gratuity/tip" as one in the same. Nevertheless, in support of its position, the majority declares that, because there is no definition of "gratuities of any kind" in either HRS § 387–1 or DLIR § 12–20–1, "we must assume that the legislature would not enact superfluous language [and therefore] 'gratuities of any kind' must be something other than 'tips.'" Majority opinion at 355, 893 P.2d at 783 (citations omitted). However, the implication that "something other than tips" includes a service charge is simply wrong. Such a holding would be incongruous because DLIR § 12–20–1 specifically and plainly draws a bright line between "tips *or* gratuities" and compulsory or negotiated service charges, *e.g.*, porterage, thereby establishing two separate and distinct categories.

Furthermore, the definitions found in the Master Agreement, as agreed to by the Bellhelp and the Hotels, are consistent with the DLIR definitions. "Tips," as defined under DLIR § 12–20–1, is identical to the definition of "gratuity/tip" found in the Master Agreement; likewise, the phrase "compulsory or negotiated service charges," as defined under the regulation, is equivalent to the definition of porterage found in the Master Agreement.

I agree with the majority that "the DLIR is only authorized to define relevant terms [of chapter 387 Wage and Hour] as long as its definitions do not limit the generality of the terms." Majority opinion at 355, 893 P.2d at 783 (citing HRS § 387–11). Indeed, the plain and unambiguous language of the statute and DLIR § 12–20–1 indicate that the DLIR has not limited the generality of the term "gratuities of any kind," which obviously includes any gift or gratuity *voluntarily* bestowed, be it monetary or non-monetary or be it in recognition of service or for no

particular reason. However, to conclude, as the majority does, that compulsory service charges may be included in "gratuities of any kind" is illogical and expands the generality of the term to render it meaningless because it disregards the distinction between tips or gratuities and service charges set forth by the statute, the DLIR, and the Master Agreement.

Gratuities/tips have been used similarly by other sources as well. For example, the Internal Revenue Service (IRS) examined a club that did not permit tipping, but added ten percent to cafe charges against members' accounts, which amounts were then disbursed to waiters. In finding that these amounts constituted wages within the Social Security Act, the IRS held that "the 10 per cent added to the cafe charge is an arbitrary charge fixed by the club which the member is required to pay and is clearly not a gratuity." S.S.T. 145, 1937–1 C.B., *superseded in* Rev. Rul. 69–28, 1969–1, C.B. 270. Additionally, as the majority recognizes, title 29, sections 531.55(a) and (b) of the Code of Federal Regulations clearly hold that service charges may be used to satisfy the wage requirements of the Fair Labor Standards Act (FLSA).

The majority states that "upon superficial examination, it would seem logical to conclude that porterage payments are not gratuities because they are neither voluntary nor discretionary." Majority opinion at 358, 893 P.2d at 786. I submit that, even upon a more in-depth examination, this conclusion is more than "seem[ingly] logical," it is manifestly logical. Under the plain meaning of the Master Agreement, a gratuity, unlike porterage, is a gift or payment that is *freely and voluntarily given* by the hotel guests; a service charge, such as porterage, is not. Therefore, porterage simply cannot be considered "gratuities of any kind."

Courts in other jurisdictions have also held that compulsory service charges are not gratuities, and therefore, service charges fall within the applicable statutory definition of wage. For example, in *Restaurants and Patisseries Longchamps, Inc. v. Pedrick*, 52 F.Supp. 174 (S.D.N.Y.1943), the plaintiff brought an action to recover employment

taxes that it alleged were erroneously assessed. The plaintiff operated a number of restaurants where tipping was not permitted, but where customers were assessed a ten percent service charge, which was then apportioned among certain staff members. In finding that the charges constituted wages within the Federal Insurance Contributions Act, the court held that "[a] patron in a restaurant is under no compulsion to leave a 'tip.' In the instant case[,] the voluntary aspect is completely eliminated." *Id.* at 174–75.

In *Cohen v. Playboy Clubs International, Inc.*, 19 Ill.App.3d 215, 220–21, 311 N.E.2d 336 (1974), the court examined whether a fifteen percent mandatory service charge, added separately to the bills of private club members, was properly taxable under either of two taxes. The plaintiff maintained that the service charge, which stated that it included a gratuity, was, in effect, a tip or gratuity. The court found this contention to be without merit, holding that

> [t]he service charge, though a fixed percentage of the bill, is mandatory. The customer has no discretion as to the decision to pay or not to pay the amount of the payment. He may or may not leave an *additional amount* as a gratuity. If he does, *that* amount is within his personal discretion. However, the service charge is not in any sense gratuitous.

*Id.* at 220–21, 311 N.E.2d at 340 (emphasis in original). The *Cohen* court noted that the fact that the service charge may be segregated from the food and beverage charges and that the service charge passes on to the waitstaff did not change the correctness of its holding. *Id.*

The question before the court in *Beaman v. Westward Ho Hotel Co.*, 89 Ariz. 1, 357 P.2d 327 (1960), was whether a "service charge" constituted wages for which contributions to the Unemployment Compensation Fund were required to be paid. In that case, the hotel, which did not permit tipping, charged a service fee to its banquet and club customers, which was then passed on to the staff. In holding that the service fees were not tips but wages under the applicable Arizona statute,[2] the court stated that

> [w]hatever the payments in question here may be, they are not tips. They are not in any sense gratuitous. The patron does not control the amount, if any, to be given the one who waits on him. He does not even have anything to say about who shall share in the distribution of the money. It is common knowledge that patrons do not as a rule tip [those] with whom they do not come into direct contact. A tip is in law, if not always in fact, a voluntary payment. It is not the subject of negotiation or contract, as are the "service charges" here.

*Id.* at 4, 357 P.2d at 329.

In *Cuevas v. Monroe Street City Club, Inc.*, 752 F.Supp. 1405 (N.D.Ill.1990), to which the majority cites in footnote 5 on page 354–355, 893 P.2d on page 782–783 of the majority opinion, eight ex-employees sued a private dining club, alleging violation of the FLSA. When examining the plaintiffs' minimum wage claims, the court held that most of the plaintiffs had received weekly pay in excess of the minimum wage requirements for the total hours worked because, "[a]lthough the wage agreements ... were for $2.01 per hour[,] ... [plaintiffs] also received shares of a *compulsory service charge* billed to customers, [and] *those shares are included in the determination of actual minimum wages paid* to employees[.]" *Id.* at 1417 n. 18 (internal citation omitted and emphasis added); *see also Marshall v. Newport Hotel*, 24 Wage & Hour Cas. (BNA) 497, 503, 1979 WL 15529 (1979).

The *Cuevas* court referenced the provisions of title 29, sections 531.55(a) and (b) of the Code of Federal Regulations as supportive of its holding, which, as noted above, provide that compulsory service charges may be used to satisfy the wage requirements of the FLSA.

---

**2.** The Arizona statute in question provided in pertinent part that " '[w]ages' means all remuneration for services from whatever source, including commissions and bonuses and the cash value of all remuneration in any medium other than cash." A.R.S. § 23–622 (1947). Although this statute is broader than HRS § 387–1, the *Beaman* court's analysis of the distinction between tips/gratuities and service charges remains highly relevant.

Moreover, in Revenue Ruling 66–74, Cumulative Bulletin 1966–1, the IRS advised that, when a club that does not permit direct tipping collects mandatory "gratuities" from its customers, the service charge so collected is not a tip or gratuity, but a wage subject to applicable taxes. The IRS noted that it has consistently held service charges to be wages and has differentiated between such charges and tips or gratuities. *See also* Rev.Rul. 59–252, 1959–2 C.B. 215; Rev.Rul. 57–397, 1957–2 C.B. 628.

The majority summarily dismisses the relevance of the plethora of authority holding that compulsory service charges are wages on the basis that many of these authorities involve tax issues. Majority opinion at 356–357 n. 11, 893 P.2d at 784–785 n. 11. However, the majority fails to cite any authority for the proposition that compulsory service charges are gratuities. Their reliance on the proposition that parties may contract to include porterage within the phrase "gratuities of any kind" is irrelevant and misplaced because, as discussed *infra*, the Master Agreement in this case does not include such an agreement. The majority also states that, had the legislature intended to have wages interpreted broadly to include porterage, they would have done so. *Id.* I submit that the legislature has done so by specifically providing that "every employer shall pay to each employee employed by the employer wages," HRS § 387–2, and that " 'wage' means legal tender of the United States." HRS § 387–1. Such expansive language that only excludes tips or gratuities clearly includes service charges, which includes port-

erage. I also submit that had the legislature intended to exclude service charges from the definition of wage, or include service charges within "gratuities of any kind," the language was readily available for so stating. In any event, none of the positions taken by the majority turns porterage, as a compulsory service charge, into a gratuity.

Relying on *St. Paul Hilton Hotel v. Commissioner of Taxation,* 298 Minn. 202, 214 N.W.2d 351 (1974),[3] and Rutledge's affidavit, the majority contends that "porterage was designed to replace the tips and gratuities lost by the [B]ellhelp with the advent of large tour groups." Majority opinion at 358, 893 P.2d at 786. The majority, citing to section 38.7(a)(1) of the Master Agreement, takes the position that *"porterage retains an element of discretion or voluntariness,* [and is] unlike typical service charges, because non-prearranged groups who visit the Hotels can choose for themselves to be handled as a group, with the convenience of porterage, or individually, under the tip system." Majority opinion at 358 n. 13, 893 P.2d at 786 n. 13 (emphasis added). The majority also notes that, when hotel guests opt for group baggage handling, but refuse to pay porterage, "the Master Agreement contractually obligates the Hotels to pay [to its employees the] guaranteed amount [established for pre-arranged group movement]." Majority opinion at 358 n. 13, 893 P.2d at 786 n. 13.

Clearly, the fact that guests in a non-prearranged group can choose, upon arrival at a hotel, to be handled as a pre-arranged group[4] is of no consequence as to whether porterage is discretionary or voluntary. It

3. Although the majority limits their reliance on *St. Paul Hilton,* I note that *St. Paul Hilton,* is clearly distinguishable from the present case. The sole issue before the court in that case was whether the service charge for banquets, as distinguished from tips paid by an individual diner, was deductible from the gross receipts of a sale. The Minnesota Supreme Court affirmed the tax court's decision that the state sales tax may not be imposed upon the mandatory service charge, which the hotel adds to the price of its banquet meals. The court noted that the governing statute expressly excluded the tax being applied to the amount of service charges if such charges were separately stated on the bill, which St. Paul had done in that case. The fact that the court

in *St. Paul Hilton* indicated that it discerned no distinction between service charges and tips for "sales tax" purposes has no relevance to the instant case. In fact, the Minnesota Supreme Court acknowledged that "no part of the service charge goes to the hotel-employer as operating revenue." 298 Minn. at 203, 214 N.W.2d at 352. "The apportioned sums are paid to the employees as a supplement to their regular fixed wages. We may assume this practice of dual compensation is not unknown to those who negotiate employment agreements for 'tip employees' as one segment of the personnel of a major hotel or restaurant." *Id.*

4. *See* majority opinion at 358 n. 13, 893 P.2d at 786 n. 13.

remains compulsory. Patrons of any business establishment are always free to decide whether they will avail themselves of an offered service for which a service fee is charged. The element of discretion or voluntariness applies only to the decision whether to accept or reject the offered service. Once accepted, the charge for the service is compulsory. In this case, the pre-determined charge owed to the hotel is a typical service charge, of which the amount or obligation to pay, is not controlled by the guest. Once choosing to be treated as a pre-arranged group for purposes of baggage handling, that guest is *legally* obligated to pay the established service charge for the group baggage service.

Further, it is untenable, to say the least, that porterage can be transformed, as the majority suggests, from a compulsory service charge to one that is discretionary or voluntary simply because a guest, who had opted for group baggage service, failed to pay the agreed upon fee. Under the Master Agreement, a guest's failure to pay obligates the Hotels to pay the porterage fees to the employees. Clearly, the Hotels could, in turn, elect to legally pursue the guest for any owed porterage fees. The majority concedes that the porterage fee paid by the Hotels to the Bellhelp because of non-payment by a guest would properly be designated as a wage. Majority opinion at 358 n. 13, 893 P.2d at 786 n. 13. This strained exception highlights the inconsistency of the majority's application and the mischaracterization that must be employed in order to redefine porterage fees as gratuities in this case. I submit that, under the circumstances of this case, porterage is not in any sense a gratuity.

### B. *Trade Meaning Versus Common Meaning*

The majority frames the "dispositive issue" in this case as "whether porterage falls within *the general category 'gratuities of any kind'* under HRS § 387–1."[5] Majority opinion at 355, 893 P.2d at 783 (emphasis added). Because the legislative history provides no guidance with respect to the phrase "gratuities of any kind," the majority points to the "pertinent rules of statutory construction in these circumstances," majority opinion at 355, 893 P.2d at 783, found in *In re Taxes, Hawaiian Pineapple Company, Limited,* 45 Haw. 167, 363 P.2d 990 (1961), to support their holding that the Hotels are not entitled to summary judgment as a matter of law. The "pertinent rule" on which the majority focuses essentially provides that, where a statute regulates a business, the words of such statute should be given the meaning as understood in the business rather than their ordinary meaning, and such trade or commercial meaning is a fact to be proved in each case. What the majority neglects to point out is that in *Hawaiian Pineapple,* this court has stated that "[t]he rule presuming the trade meaning of words in a statute involving or directed at a particular trade is the exception[,]" *id.* at 177, 363 P.2d at 996, and "[i]n order to invoke the presumption in any case, it is necessary that the trade meaning of the term under consideration be adequately proven." *Id.* at 179, 363 P.2d at 997. Further, this court implicitly held that the burden of proving a "commercial or trade meaning" to defeat the "common meaning" is on the party asserting the trade meaning. Because the legislative intent as reflected in HRS § 387–1 and DLIR § 12–20–1 is clear, the Bellhelp are foreclosed from asserting that the service charge of porterage is a gratuity.

However, even assuming, but not agreeing, that the majority is correct, review of the record clearly indicates that the business or trade meaning of the terms at issue in this

---

5. I note that, although the majority frames the dispositive issue as referred to above, it then renders its conclusion and holding inconsistent with the issue as framed. The majority concludes that "porterage may be considered *in the nature of 'gratuities'* for the purposes of HRS § 387–1 and HRS § 387–2." Majority opinion at 357, 893 P.2d at 785 (emphasis added). Subsequently, the majority holds that "the Hotels are not entitled to summary judgment because the

Bellhelp have raised a genuine issue of material fact as to *whether 'porterage' is a 'gratuity of any kind.'*" Majority opinion at 359, 893 P.2d at 787 (emphasis added). Whether the majority means to imply that the issue in this case is somehow broader than the statement of issue in its final holding, I will not speculate but merely agree that the issue here is whether porterage is a gratuity of any kind under HRS § 387–1.

case would yield the same result. The "business" in this case is the hotel industry. The trade meaning of the terms "gratuities" and "porterage" as defined by the parties directly involved in the hotel industry is clearly set forth in the Master Agreement. As previously stated, under the Agreement a "gratuity/tip" is "any gift or payment given by a guest or customer for service rendered." Master Agreement, section 38.6(A). "Porterage" is defined separately in section 38.6(B) of the Agreement "as any service charge or pre-negotiated payment by a guest [or] a customer for service rendered." Clearly, under "the meaning [of the subject terms] as understood in the business," gratuities are not porterage. Therefore, the majority's assumption that the trade meaning of "porterage" and "gratuities of any kind" are facts to be resolved at trial, is erroneous. The Master Agreement is clear and unambiguous. When a contract between two parties has a readily discernible meaning, there is no need to search for extrinsic evidence to illuminate already clear wording. *See Cho Mark Oriental Food v. K & K International*, 73 Haw. 509, 520, 836 P.2d 1057, 1063–64 (1992) ("A contract term or phrase is only ambiguous when it is capable of being reasonably understood in more ways than one."); *Pelosi v. Wailea Ranch Estates*, 10 Haw.App. 424, 436, 876 P.2d 1320, 1327 ("if the language ... is clear and unambiguous ... construction of the covenant is a question of law, appropriate for summary judgment disposition" (citations omitted)), *reconsideration denied*, —— Haw. App. ——, 879 P.2d 591, *cert. denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994); *see also Smith v. New England Mutual Life Ins. Co.*, 72 Haw. 531, 537, 827 P.2d 635, 638 (1992); *Amfac v. Waikiki Beachcomber Inv.*, 74 Haw. 85, 108, 839 P.2d 10, 24, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

In concluding that a genuine issue of material fact exists, the majority mistakenly relies on extrinsic evidence, namely, the prior Master Agreements, Rutledge's affidavit, and the employee pay stubs. The majority implies that, because of the historical development of porterage as a kind of gratuity, the issue whether porterage fees are gratuities or wages within the meaning of HRS § 387–1 must be resolved at trial and not at the summary judgment stage. However, because the language defining porterage and gratuities in the current Master Agreement is unambiguous, the extrinsic evidence upon which the majority relies is inadmissible. *See* Hawai'i Rules of Civil Procedure Rule 56(e) ("[s]upporting and opposing affidavits ... shall set forth facts as would be *admissible in evidence ....*" (Emphasis added.)).[6]

Nevertheless, even if I were to agree that the extrinsic evidence may have been appropriately considered, the current Master Agreement evinces a different and distinct treatment of porterage by the Hotels and the Bellhelp when they agreed on the definition of porterage as a "service charge or pre-negotiated payment." The specific intent of the Bellhelp to treat porterage differently than in the past is acknowledged by the majority's statement that the "uncontested affidavit submitted by Rutledge claims that porterage was *designed to replace the tips and gratuities* lost by the [B]ellhelp with the advent of large tour groups." Majority opinion at 358, 893 P.2d at 786 (emphasis added). Clearly, the fact that the current Agreement specifically defines porterage as a "service charge or pre-negotiated payment" and the fact that porterage was not included within

6. The majority's reliance on *DiTullio, see* majority opinion at 357, 893 P.2d at 785 n. 12, in support of its statement that "the 'extrinsic evidence' provided by the Bellhelp is admissible" is misplaced. Here, the parties' intent as to the terms at issue, that is, "porterage" and "gratuity", are unambiguously defined in the current Master Agreement. However, unlike the instant case, *DiTullio* involved terms wholly ambiguous and undefined by the parties. In *DiTullio,* the term "stockholder," which denoted a class of insured persons in a corporate liability insurance policy was ambiguous because the corporation had no "stockholders." The term "executive officer," which also denoted a class of insureds, was ambiguous because that term was not defined in the insurance policy, the corporation's charter, or the by-laws. Under these facts, the Intermediate Court of Appeals properly held that extrinsic evidence was admissible to explain the intent of the parties with respect to the use of the ambiguous terms "stockholder" and "executive officer," thus raising genuine issues of material fact.

the definition of "gratuity/tip" demonstrates a conscious choice and recognition by the parties that porterage fees are not gratuities. When parties to a contract unambiguously define the terms therein, there is no room for interpretation. *Hanagami v. China Airlines,* 67 Haw. 357, 688 P.2d 1139 (1984). Further, it is well established that the court's function is to construe and enforce contracts made by the parties, not to make or alter them. *Strouss v. Simmons,* 66 Haw. 32, 657 P.2d 1004 (1982); *Scotella v. Osgood,* 4 Haw. App. 20, 659 P.2d 73 (1983).

### C. *Ownership of Porterage Is Irrelevant*

Relative to section 38.5(A)(1) of the Master Agreement, wherein porterage is deemed to be the "exclusive property" of the Bellhelp, the majority takes the position that

> the Hotels are not prohibited by HRS chapter 387 from reaching an agreement with Local 5 to (1) collect "porterage" from hotel guests on behalf of the Bellhelp, and then (2) transmit this "exclusive property" of the Bellhelp as an addendum to their paid wages. *Cf. Williams,* 315 U.S. at 397–98, 62 S.Ct. at 666–67 (permitting the opposite arrangement, where gratuities in the form of tips are included in employee wages pursuant to an agreement between the parties); *Hayden v. Bowen,* 404 F.2d at 686 (inferring from *Williams* that tips should be excluded absent such an agreement).

Majority opinion at 355–356, 893 P.2d at 783–784 (footnote omitted).

First, the Master Agreement *does allow* the Hotels to "collect 'porterage' from *hotel* guests on behalf of the Bellhelp." Second, the majority's reliance on *Williams* as supporting the proposition that nothing in chapter 387 prohibits an arrangement whereby porterage would be transmitted to the Bellhelp as an addendum to their paid wages is misplaced.

In *Williams,* after passage of the FLSA, two railroad terminal companies informed redcaps that they would be guaranteed the minimum wage and that tips from travelers would be included in determining the amount the railroads would pay. The Supreme Court examined the contention of the redcaps that the railroads were statutorily required to pay them the minimum wage exclusive of any tips they received. In holding that the tips were actually compensation paid to redcaps and therefore *includable* as wages, the *Williams* Court stated:

> Where … an arrangement is made by which the employee agrees to turn over the tips to the employer [to be paid as wages to its employees], *in the absence of statutory interference,* no reason is perceived for its invalidity. The employer … may take the compensation paid by travelers for the service, whether paid as a fixed charge or as a tip.

*Id.* at 397–98, 62 S.Ct. at 666–67 (emphasis added, internal citations and footnote omitted).

It is important to note that, at the time *Williams* was decided, the term "wages" in the FLSA "ha[d] no fixed meaning either including or excluding gratuities." *Id.* at 407, 62 S.Ct. at 671. Both *Williams* and *Hayden* were decided prior to an amendment explicitly excluding tips from minimum wage calculations, and, although the majority would have us believe otherwise, neither case allowed a party to circumvent the clear direction of a statute by way of an agreement. The majority claims that "the ability to contractually designate ownership of gratuities is consistent with currently applicable regulations," Majority opinion at 356 n. 8, 893 P.2d at 784 n. 8, and cites the following language found in title 29, section 531.52 of the Code of Federal Regulations: *"In the absence of any agreement to the contrary* between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer." Majority opinion at 356 n. 8, 893 P.2d at 784 n. 8 (emphasis added by majority). I note, however, that the aforementioned sentence is preceded by the following language:

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for [the customer]. *It is to be distinguished from a charge, if any, made for the service.* Whether a tip is to be given, and its amount, are matters determined solely by the customer, and generally [the customer] has the right to

determine who shall be the recipient of [the] gratuity.

29 C.F.R. § 531.52 (emphasis added). Clearly, the aforementioned language differentiates between gifts presented voluntarily by a customer and pre-determined service charges. The fact that the Code of Federal Regulations treats tips in a particular manner has no bearing on the clear mandate of Hawai'i's minimum wage statute, which does not in any manner exclude service charges, such as porterage, from the definition of wage. Therefore, under the circumstances of this case, the parties are not free to redefine the service charge or porterage as a gratuity, in contradiction of HRS § 387-4.5, which provides that "[n]o provision of [chapter 387] may in any way be contravened or set aside by private agreement." Moreover, even if the parties herein were free to contract, as the majority suggests they could pursuant to HRS § 387-13 (to bargain collectively to establish a minimum wage in excess of that prescribed by law), they did not do so, and the Master Agreement clearly does not contain any agreement that porterage payments are to be excluded as gratuities from the definition of "wages."

Additionally, the fact that porterage "shall be considered the exclusive property of the bargaining unit employees and are payable only to the appropriate bargaining unit employees," Master Agreement, § 38.5(A)(1), has no relevance to whether porterage payments are gratuities. In any business, certain monies may be earmarked as belonging to a landlord, utility company, employee or other creditor. A designation of ownership of porterage, which is passed through the employer to the Bellhelp, does not change the fact that such amounts are not discretionary or voluntary payments by the guests. For example, as the Supreme Court in *Williams* stated:

> To interpret "pay wages" [7] as limited to money passing from the terminal to the redcap [thereby excluding tips to the red caps] would let construction of an important statute turn on a narrow technicality.

It, of course, can make no practical difference whether the redcaps first turn in their tips and then receive their minimum wage or are charged with the tips received up to the minimum wage per hour.

*Id.* at 407, 62 S.Ct. at 671. Here, there is no practical difference as to whom the parties designate as the owner of the porterage because such fees are not voluntary or discretionary and, thus, not gratuities. More importantly, "wages" under HRS § 387-1, unlike the FLSA prior to its amendment, has a fixed meaning—it excludes tips and gratuities, but does not exclude service charges or porterage.

### D. *Hawai'i's Tip Credit Allowance Is Irrelevant*

The majority's reliance on the amount of Hawai'i's tip credit allowance is irrelevant to the case before us. In 1966, the FLSA was amended to provide a tip credit to employers. As a result, in certain cases, employers could count a certain percentage of the tips received by their employees when making up the minimum wage requirements. In 1969, Hawai'i established a tip credit. Although the amount of federal tip credit allowed has fluctuated over time, Hawai'i's tip credit allowance has remained at twenty cents, despite the subsequent increases in Hawai'i's minimum wage. The majority concludes that Hawai'i's relatively small tip credit allowance somehow evinces a legislative intent regarding the assignment of porterage. The majority interprets Hawai'i's minimal tip credit allowance as standing for the proposition that employers in Hawai'i are expected to meet their minimum wage requirements with their "own money." As previously noted, the Master Agreement's provision of "exclusive property" does not transform porterage into a gratuity.

The fact that the legislature has chosen to address tips in a particular manner has no bearing on its treatment of service charges. The majority has presented no persuasive nexus between the two distinct categories nor have they presented any persuasive evi-

---

7. The phrase "pay wages" is found in section 6 of the FLSA, which provides in pertinent part: "Every employer shall *pay* to each of the employees ... *wages* at the following rates...." (Emphasis added.)

dence of legislative intent that the two distinct categories were meant to be tied together so torturously. The majority concedes that porterage is not a tip and, by suggesting that porterage may fall into the category of "gratuities of any kind," the majority essentially creates a third category, namely, "compulsory gratuities," which is an oxymoron.

### E. *No Genuine Issues of Material Fact Exist*

The Bellhelp assert that summary judgment should not be granted as there remains a material issue of fact regarding whether porterage is a gratuity in trade usage. It is well settled that summary judgment is appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Ross v. Stouffer Hotel Co. (Hawai'i), Ltd.*, 76 Hawai'i 454, 457, 879 P.2d 1037, 1040 (1994). Here, the Bellhelp had the opportunity but failed to make a sufficient showing to defeat summary judgment; consequently, their appeal must fail. *See Rumbaoa v. J. Rudnick & Sons, Inc.*, 863 F.Supp. 1193, 1195 (D.Haw.1994) ("At least some significant probative evidence tending to support the complaint must be produced."); *Hall v. State*, 7 Haw.App. 274, 284, 756 P.2d 1048, 1055 (1988) (summary judgment is appropriate when party fails to make a sufficient showing), *cert. denied, sub nom., Hall v. Hawai'i*, 488 U.S. 803, 109 S.Ct. 33, 102 L.Ed.2d 13 (1988); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Because there is no question that, under the circumstances of this case, porterage fees are not gratuities within the meaning of HRS § 387–1, I would affirm the trial court's ruling that, as a matter of law, porterage can be used by the Hotels to satisfy their obligation to pay the minimum wage established by HRS § 387–2.